152 So.2d 369 (1962)
Lucius FORSYTH
v.
JEFFERSON DOWNS, INC.
No. 521.
Court of Appeal of Louisiana, Fourth Circuit.
September 17, 1962.
On Rehearing April 1, 1963.
Rehearing Denied May 6, 1963.
Certiorari Refused June 28, 1963.
*370 Lemle & Kelleher and H. M. Hunley, Jr., New Orleans, for defendant-appellant.
F. Irvin Dymond, Robert S. Link, Jr., and Donald S. Klein, New Orleans, for plaintiff-appellee.
Before MILLER, VIDRINE and CUTRER, JJ.
JOE R. VIDRINE, Judge.
This is a suit by Lucius Forsyth, the owner of a race horse, "Buster Jim Boy", for damages occasioned by the horse's death. On September 14, 1959 this race horse was training on the Jefferson Downs Race Track when upon reaching a spot where a section of the inner railing had been removed, and had not been replaced, the horse swerved into the opening and disemboweled himself on the iron post.
In the trial on the merits in the court below, judgment was rendered for the plaintiff and the defendant has appealed.
Plaintiff-appellee filed suit for damages against Jefferson Downs, Inc. in the amount of Thirty-five Thousand ($35,000.00) Dollars for the loss of this horse. The trial court awarded judgment for the plaintiffappellee in the amount of Seven Thousand Five Hundred ($7,500.00) Dollars, plus legal interest and costs. The trial court found that the death of the horse was caused by the negligence of the defendant-appellant.
Jefferson Downs, Inc. operates a race track in Jefferson Parish to race thoroughbred race horses. The race track has as many as nine hundred (900) horses stabled there for the mutual benefit of the track owner and owners of the horses. The horse owner has the right to certain stables, which he pays for at the rate of .50¢ a day, per horse, and thereby has the right to exercise and/or train his horse prior to the racing season. It appears in this case that the plaintiff had, at the time of this accident, nine (9) horses in the stables at Jefferson Downs. The record reveals that repairs and construction was going on prior to September 14, 1959, the day the accident *371 occurred. The appellant foresaw the possibility of some accident occurring while this construction was going on, because of the heavy equipment laid out on the track, and called in several trainers, who handle the horses for the owners, and had them sign an instrument which purports to hold harmless the track owner for any accident which might have occurred during said construction period. The trainer of the appellee herein, I. J. Surgi, signed this agreement to the effect that they were training their horses at their own risk and further agreed that the horse would not be exercised after the hour of 8:00 A.M., during the period of construction.
On September 14th at about 9:30 A.M. the plaintiff's horse was exercising, which means running on the track, and saw an open gap in the inner rail and swerved into this gap, hitting himself on the post, which resulted in his death.
The appellant contends that the lower court erred on several grounds. First, that the trainer of the plaintiff who had full control of the horse and thereby stood in the shoes of the owner, assumed the risk voluntarily in training this horse during this construction period. And also that the trainer had completed authority to sign the written agreement to which we alluded above and therefore the plaintiff cannot recover under this agreement. The third assigned error was that the plaintiff's horse was not to run at Jefferson Downs, and therefore, only those taking part in the races were permitted to train. Hence, plaintiff was a mere licensee on the track and took the premises as he found them. It is argued plaintiff's horse was entitled to only care from wanton or wilful injuries. Fourth, that the plaintiff's trainer and the exercise boy were guilty of contributory negligence and therefore bars the plaintiff from recovery. Fifth, that the award of $7,500.00 is excessive and should be reduced to not more than $2,000.00, in the event this court should find that the appellee is entitled to recover anything.
The trial court held that the accident occurred after construction had been completed, stating:
"The death of the horse was not occasioned by the repairing of the track, but as a result of negligence outside of the repairs."
The record amply supports this finding.
The argument that appellee was a mere licensee on the track is untenable. The record reveals that the appellee paid the track to keep his horses and stables for the privilege of exercising and training his horses. It was for their mutual advantage. The fact that this one particular horse was not scheduled to run at Jefferson Downs is unimportant. The important thing is that the appellee who had nine (9) horses at the stables at Jefferson Downs was paying for this particular horse as well as the other horses and therefore, the appellant owed him the duty that a business invitee is entitled to, that is to maintain the premises in a reasonably safe condition. Alexander v. General Accident F. & L. Assur. Corp., La. App., 98 So.2d 730.
The argument that the plaintiff's trainer and the exercise boy were contributorily negligent in running the horses too close to the rail is likewise untenable. The record reveals that it is the custom and the habit of race horses to run alongside the inside rail and never, except on rare occasions, does it happen that the horse will be exercised alongside the outside rail. Therefore, the exercise boy and the trainer, who had no knowledge of the gap, were not contributorily negligent.
The trial court resolved these facts in favor of the appellee. We find that the record amply supports its findings and no reversible error was committed by the trial court.

QUANTUM
The next question that comes up is the amount of the award which was made by the lower court. The trial court suggested *372 in its judgment that it was extremely difficult for it to arrive at a fair value of this horse. The trial court bases its $7,500.00 award primarily on the fact that the evidence reveals that the horse had very good blood lines and also on the fact that a brother of this same horse was sold for $20,000.00. The appellant argues that since the appellee had entered this horse in several claiming races for $2,000.00, that this horse should not be valued any higher than that. It was shown that unlike other things of value, a race horse might be worth $2,000.00 one day and the next day $20,000.00, and likewise he might be worth $25,000.00 today and tomorrow he might be worth $200.00, depending on what happens to the horse. The record reveals that while this horse had been unsuccessful in several races, he did win the last race and the evidence also reveals that this was a very young horse and he was apparently just beginning to run to win.
We agree with the trial court that it is extremely difficult to arrive at a value for this horse. However, because of the fact that this horse had good blood lines; that its brother had been sold for $20,000.00; that it had won its last race, and was a young horse, just beginning to run to win, the award of $7,500.00 is not excessive.
For reasons above assigned, the judgment of the lower court is affirmed. Appellant to pay all costs.
Affirmed.
MINOS D. MILLER, Judge (dissenting).
Although I agree that defendant is liable in damages for the death of the thoroughbred race horse, Buster Jimboy, in my opinion the trial court committed manifest error in awarding damages of $7,500.00. There was no evidence, appraisal or expert opinion in the record concerning the market value of this horse on the date it met its death. There is some testimony about his blood lines, his racing record and some vague statements by plaintiff himself that Buster Jimboy was worth more than another horse.
The most convincing evidence in the record about the value of this 3-year old thoroughbred is his size (15 hands high and approximately 1,000 lbs.) and his mediocre record in the nine races in which Buster Jimboy had run. In his races from April 29, 1958 through May 12, 1959, he finished fourth in one out of a field of ten, fifth in a field of seven, sixth in a field of ten, fifth in a field of eight, eighth in a field of ten (twice), seventh in a field of ten and ninth in a field of ten. Three of the races in which the horse had run were $2,000.00 claiming races and one was a $2,500.00 claiming race. On May 21, 1959 in a six and one-half furlong claiming race for three year old maidens at Cahokia Downs, in which Buster Jimboy could have been claimed for $2,000.00, Buster Jimboy finished first out of a field of ten horses. The Daily Racing Form Chart shows that in that race two of the other horses had a claiming price of $2,000.00, two horses had a claiming price of $1,750.00, and five horses had a claiming price of $1,500.00. The Form Book shows that the track at the time of the race was sloppy; that the record time for the race was 1:17 4/5 and that Buster Jimboy's time in winning this race was 1:23 3/5. There is no testimony by any of the witnesses to indicate that this racing record would justify an award of $7,500.00.
Concerning the bloodlines of Buster Jimboy, we have only the testimony of the owner, Mr. Forsyth and the trainer, Mr. Surgi. They did not attempt to document their testimony, but neither did the defendant attempt to discredit their testimony that Buster Jimboy was sired by Diamond Jimmy; that Diamond Jimmy was sired by Count Fleet, and his dam was Djeljh. While there was no testimony concerning the bloodline of the dam, Djeljh, the sire, Count Fleet, is recognized as one of the top thoroughbreds. Buster Jimboy's dam was Jimmy's Rose, out of Zacaweista Way by a stud named Hash.
*373 The testimony that a brother of Buster Jimboy was sold for $20,000.00 is hearsay evidence. Accepting the hearsay evidence as true, the horse that brought $20,000.00, Iberia Diamond, was also sired by Diamond Jimmy, but his dam was some unidentified mare. So at best Buster Jimboy is only a half-brother to the horse which allegedly sold for $20,000.00. The hearsay evidence also indicates that this half-brother, Iberia Diamond, never raced. Plaintiff testified Diamond Jimmy sired other foals which were out in the Evangeline country and that he didn't know anything about them, and admitted that "if they would be an outstanding horse, I would know about it."
This general testimony, which was presented without setting forth what, if any, value should be allowed for these desirable features, does not appear to me to justify an award of $7,500.00.
It was stipulated that when a horse is entered in a claiming race any owner who has a horse participating in the race is given the privilege of buying any other horse in the race for the claiming price. Plaintiff's trainer, Irwin Surgi, testified that if a horse runs in three $2,000.00 claiming races and there are no "mishaps", then in his opinion the horse was worth $2,000.00. Plaintiff makes no effort to contradict this statement, and as heretofore noted, Buster Jimboy ran in three $2,000.00 claiming races.
Not one witness testified as to what price would have been paid by a willing buyer to a willing seller, for the horse on the day Buster Jimboy was killed. Plaintiff's own testimony as to the value of the horse is summarized while he was on cross-examination as follows:
"Q. You testified that the horse was worth Thirty-five Thousand ($35,000) Dollars; did you not?
"A. No. I never testified that.
"Q. Well, how much was it worth?
"A. He might have been worth a whole lot more than Thirty-five Thousand ($35,000) Dollars.
"Q. Was he worth less?
"A. He could have been worth less, and he could have been worth a lot more.
"Q. What value would you say he was worth?
"A. That would have been up to the horse. You can't go ahead and say how much a horse is going to be worth. The horse may improve and be worth a lot more than he was run for.
"Q. How much more?
"A. It depends on how good he was going to get.
"Q. But you don't know how much better he was going to get; do you?
"A. No."
In my opinion an award of $7,500.00 on the testimony hereinabove summarized is not justified. The plaintiff bears the burden of proving the value of his claim. Defense counsel has alternatively asked that the award be reduced to $2,000.00. Although the record shows that those race horse owners who had the right to claim Buster Jimboy for $2,000.00 declined to do so, it is my opinion that an award of $2,000.00 would be justified.
I respectfully dissent from the judgment of this Court awarding damages of $7,500.00.

ON REHEARING
Before REGAN, YARRUT, SAMUEL, CHASEZ and HALL, JJ.
CHASEZ, Judge.
This is a re-hearing on all issues of a suit to recover $35,000.00, the alleged value *374 of a race horse fatally injured while training on defendant's track. The trial court held the defendant to be negligent and allowed recovery of $7,500.00, which judgment was affirmed on the original hearing of this case.
The record shows that while plaintiff's horse was training on defendant's race track between 9:30 and 10:00 a. m., on September 14, 1959, it reached a gap where the inner railing had been removed in connection with construction work in progress on the track and not replaced, at which point the horse shied and swerved into the opening, disemboweling himself on the opposite rail post.
Plaintiff charges defendant with negligence (1) in advising plaintiff he could resume training on September 14, 1959 when the track was not safe for his horse; (2) in failing to replace the removed section of inner railing; and (3) in failing to provide a safe race track for plaintiff, who was allegedly a business invitee.
Defendant simultaneously filed exceptions of no right of action and no cause of action and an answer denying (1) that plaintiff had been told on September 14, 1959 that the track was again safe for training; (2) all allegations of negligence and specially pleaded a written "hold-harmless" agreement signed by plaintiff's agent, Surgi, which reads as follows:
 "August 31, 1959
"Jefferson Downs, Inc.
"P. O. Box 23061
"New Orleans 23, Louisiana
"Gentlemen:
"We, the undersigned Horsemen, agree that our horses are exercising or training on the race track at our own risk and that any injury to the exercise boy, jockey, or trainer or any injury to the horses will be at our own risk and that we will not exercise any horses after 8:00 AM in the morning; this is during the period of construction.
 "/s/ Frank Behler /s/ W. Graffagnini
 "/s/ I. J. Surgi /s/ C. B. Sanders
 "/s/ Frank Forester /s/ C. V. Beall
 "/s/ T. Guarneri /s/ S. E. De Longa
 "/s/ Lester S. Pailet /s/ C. Tassistro"
In the alternative, defendant pleaded assumption of risk and contributory negligence.
The trial court found negligence on the part of defendant as alleged; that the "hold-harmless" agreement executed by plaintiff's trainer, I. J. Surgi, was inapplicable, and did not bar recovery, since the death of the horse did not result from construction operations.
On the original hearing of this appeal this court dismissed consideration of the "hold-harmless" agreement and the alternative pleas filed by defendant. The court stated:
"The trial court held that the accident occurred after construction had been completed, stating:
"`The death of the horse was not occasioned by the repairing of the track, but as a result of negligence outside of the repairs.'
"The record amply supports this finding."
*375 The first issue here is a consideration of the "hold-harmless" agreement and its intent.
To determine the intent of this agreement it is therefore necessary to examine the circumstances leading to its confection. During the summer of 1959 soft spots appeared in the track. The President of Jefferson Downs, Inc., Mr. C. Ray Edmonds, a graduate engineer, desired the track to be in first class condition for the coming racing season and in order to accomplish this result it was found necessary to place in and on the track about 5,000 yards of top soil and 600 yards of red clay to remove the soft spots which had developed in the track. Heavy equipment was used all over the track to alleviate the soft spots and to grade the track. The main concern before this meet was the inside rail where water could fall and get into these soft spots, creating quite a problem. Sections of the inner rail had to be removed in order to get the equipment on the inside of the track to fill the soft spots that were allowing lake water to seep up under the track, and to push back on to the track the top soil that had washed off.
Mr. Edmonds was quite concerned because they were removing all of the inner rail, and putting hardwood curbing on the inside rail. He notified the horsemen and the trainers, by the public address system and through the stall manager and the racing secretary, that the trainers could not exercise or work their horses on the track until this construction was completed. Mr. Edmonds wanted to avoid liability for injury to horses or riders while this work was being done on the track and the track was closed for a few days.
The Horsemen's Association then formed a committee of eleven persons, including plaintiff's trainer, Mr. Surgi, who called upon Mr. Edmonds and requested that they be allowed to work their horses on the track. They agreed they would not get near the inside rail, and that when any of the big equipment was on the track itself they would not workout after 8:00 a. m. Mr. Edmonds consented and agreed that, if the horsemen would assume all responsibility for any injuries to exercise boys or horses that used the track, he would grant their request. They all agreed verbally, and later signed the agreement. Plaintiff's agent and trainer, Mr. Surgi, was aware of all circumstances and admitted his signature on the agreement; but insists that the duration of the agreement was 10 days from date. Plaintiff denied Mr. Surgi's authority to sign such an agreement on his behalf.
Frank Behler, one of the signers, testified as follows:
"Q. Mr. Behler, after you signed this instrument, what was the meaning of this instrument to you? What did this instrument mean to you and why did you sign it?
"A. It meant we could use the track again and it meant that we were using the track under our own condition. I mean if one of our hourses should get crippled or hurt it was our fault. We were taking the responsibility, just as it reads."
As to the authority of the trainers to sign on behalf of the owners, he stated, "* * * the trainer makes all the final decisions," and that the owners knew the track was under construction and they felt that if the horses were to get in shape for racing, the track had to be used.
The validity of the agreement, per se, is not an issue here and it will serve no purpose to discuss it, however, under LSA-C.C. Art. 11 it is not in contravention of public policy for a party to assume the risk of injuring himself or his property in consideration for his being allowed to use the premises of a race track.
The next issue is whether there was compliance with the conditions of the agreement.
The agreement specifically states that the trainers were not to exercise any horse after *376 8:00 a. m. The horse was killed while being exercised between 9:30 and 10:00 a. m. Mr. Surgi alleges that there were other horses on the track at that time. This may be partially explained by the testimony of Mr. Behler, to-wit:
"Q. Did anyone tell you that you could go back on the track, or what was the agreement between you and the track owners as to the date of the opening? Was there any variance in the agreement?
"A. We kept using the track. We never did bother. As the track was getting fit we kept using it and using it. We never went back to Mr. Edmonds.
"Q. Did any representative of Jefferson Downs tell you that you could resume training and exercising your horses?
"A. Tell me personally?
"Q. Yes.
"A. No, sir.
"Q. Do you know of your own knowledge if there were other trainers that were told?
"A. I couldn't answer for the others.
"Q. Did you feel that you were racing your horses at your own risk?
"A. Up until the track opened? Yes."
The duration of the agreement is questioned. There is no time limit fixed in the agreement other than: "This is during the period of construction." Mr. Surgi stated he understood the agreement was only to last about 10 days (which would have expired 3 days before the death of plaintiff's horse) because "* * * we figured the construction would be over in 10 days." Behler testified that when the Horsemen's Association called upon Mr. Edmonds they were told that the track would be closed for two or three weeks. This was on or about August 31, 1959, the date of the agreement. The evidence discloses that Mr. Edmonds stated he could not put a time limit on the "period of construction" because he did not know how long the work would take; in fact, work continued on the track until two days before it opened.
The court is of the opinion that the agreement was in force and effect at the time of the death of the horse. Evidence was elicited attempting to differentiate between "construction" and "maintenance" which the court sees no reason to discuss. Suffice it to say that Mr. Edmonds, a graduate engineer, differentiated between "construction" and repair work, and staunchly affirmed that construction was in progress on the track on the date of the accident. The testimony of Behler substantiates this view.
Mr. Edmonds was certainly qualified to give such an opinion and he swore that the track was under construction on the date of the accident. The work being done on the track was the building up of soft spots, i. e., "construction." Plaintiff himself alleged that construction was in progress on the track and is bound by his allegations. Stoma v. Smith, La.App., 172 So. 202; Bank of Coushatta v. Burch, 177 La. 465, 148 So. 680. Plaintiff did not deny construction was going on; he contended that the 10-day limit which he assumed had existed had expired and the agreement was at an end.
The true intent of the parties is given effect by interpreting the contract terms in their popular usage. We hold that this accident occurred during the period of construction. LSA-C.C. Arts. 1945-1947.
We further hold that the terms of the contract were not complied with in that plaintiff's horse was exercised after 8:00 a. m.; that after that hour plaintiff used the track at his own risk; that plaintiff had by agreement signed by his authorized agent, Surgi, assumed the risk of the accident, or at least was contributorily negligent, inasmuch as the record shows there *377 were mounds of dirt on the track on the date of the accident, as well as heavy machinery; and his recovery is barred. Spears v. American Fidelity & Casualty Company, La.App., 123 So.2d 513; Fradger v. Shaffer-Stein Corp., La.App., 73 So.2d 612; Weadock v. Eagle Indemnity Co., La. App., 15 So.2d 132; Dallas v. Crescent Forwarding and Transp. Co., La.App., 13 So.2d 113.
For the reasons above assigned, our former decree is recalled and set aside, and it is now ordered that the judgment of the district court be reversed and that there now be judgment in favor of defendant dismissing plaintiff's suit. Plaintiff is to pay all costs in both courts.
Reversed and rendered.