420 So.2d 730 (1982)
Alemitta PHILLIPS
v.
SKATE COUNTRY EAST.
No. 12981.
Court of Appeal of Louisiana, Fourth Circuit.
September 30, 1982.
Writ Denied December 10, 1982.
*731 Owen J. Bradley, Michael R. Guidry, New Orleans, for appellant.
Charles W. Schmidt, III, Christovich & Kearney, New Orleans, for appellee.
Before REDMANN, SCHOTT, BARRY, KLEES and CIACCIO, JJ.
KLEES, Judge.
On September 23, 1978, the plaintiff attended a birthday party at the Skate Country East Skating rink. The testimony revealed that while the plaintiff was skating around the rink there were two young boys who were skating very fast and weaving in and out of the traffic. These young boys passed the plaintiff several times and finally passed her again around her right side. While doing so the two boys collided in front of the plaintiff, whereupon she tripped over them and fractured her leg.
At the time of the accident the defendant had two employees working the floor as floor guards. One a middle aged gentleman, by the name of John Sammartino also had as one of his duties that of operating the music system. The other floorguard was sixteen year old Billy Ebersole.
Included in the evidence presented during the trial was a manual which described the duties and function of a floor guard. Robert Snellstrom, the manager of the skating rink, testified that these duties were designed to insure the safety and well being of the skaters and they included the prevention of fast skating, weaving in and out of traffic, and skating in the center circle; an area for the floor guards to skate in so they can quickly and easily get from one end of the floor to the other. Their duties also included informing the patrons of the rules regarding safe conduct. The defense witnesses stated that they did inform the patrons of these rules over the public address system and the plaintiff and her witnesses indicated the opposite. There was also a dispute with regard to the number of skaters on the floor at the time of the accident with the plaintiff and her witnesses indicating 100 people and the defense witnesses stating that there were only 50 people on the floor.
There were two signs in the rink which read "Skate at Your Own Risk". Counsel for the plaintiff objected to the introduction of this evidence and the objection was overruled. He also sought to question the defense witnesses as to the meaning of the sign and he was precluded from exercising this line of questioning. Finally, he offered a jury instruction to explain that such a sign does not absolve the owner from his duty to maintain a safe place but the trial judge refused to give the jury this charge.
After a trial on the merits the jury returned with a verdict in favor of the defendant dismissing plaintiff's suit.[1] The plaintiff has appealed and asserted five assignments of error.
The plaintiff's claim that it was reversible error not to give the jury the plaintiff's requested charges number three and five or some reasonable equivalent has merit.
Charge number three reads as follows:
"The defendant's contention is that Mrs. Phillips voluntarily `assumed the risk' of injury to herself when she chose to skate. When a person voluntarily uses recreation facilities, the person only assumes foreseeable risks; that is, ordinary risks associated with that particular activity. Hyland v. Durr, 212 So.2d 158.
Under the law Mrs. Phillips is not required to anticipate extraordinary unforseeable risks."
Charge number five reads as follows:

*732 "While a person who operates a place of amusement is not an insurer of his patrons, he has the duty to make his premises reasonably safe and this is more than a duty to warn patrons of danger. Gilliam v. Serrano, 162 So.2d 32.
The mere posting of a sign disclaiming responsibility for accidents, such as `skate at your own risk' does not absolve the owner from his duty to maintain a safe place."
Requested Charge Number Three
The general charge on assumption of risk given by the trial judge states that for the jury to conclude that plaintiff assumed the risk of her own injury they must find that plaintiff fully understood the danger which was involved and that plaintiff voluntarily exposed herself to that danger. In Hyland v. Durr, 212 So.2d 158 (La.App. 4th Cir. 1968) we said the following:
"It is well settled that the owner or operator of a place of public amusement is not an insurer of the safety of its patrons but is liable for injuries received by them only if guilty of negligence. It is equally well settled that one who participates in a sport assumes the ordinary risks attended upon such participation." (emphasis added)
This was essentially the content of plaintiff's requested Charge No. 3, and in this court's opinion goes beyond the general charge given by the court on the subject of assumption of risk. If the jury had been told that Plaintiff only assumed the ordinary risks attendant upon skating at defendant's facility, they could, and probably would have arrived at the conclusion that defendant was not exonerated by assumption of the risk from liability for the danger created by skaters who were speeding around, and the negligence of the operators in failing to enforce their own rules.
Requested Charge Number Five
The plaintiff contends that failure to give the jury this charge allowed the jury to be misled into concluding that the "skate at your own risk" sign completely absolved the defendant of any and all liability with regard to any injury sustained by a patron while skating, i.e., in other words, that a skating patron assumes any risk of injury.
It is obvious that from these instructions the plaintiff was attempting to inform the jury that disclaimers such as "skate at your own risk" cannot relieve one from future acts of negligence. That was the issue in Diamond Crystal Salt Company v. Thielman, 395 F.2d 62 (Court of Appeal, 5th Cir. 1968).
In that case the Theilmans were non-paying visitors of an underground salt mine who were required to execute separate releases before taking the tour. The release read in pertinent part as follows:
"In consideration of Diamond Crystal Salt Co., consenting to my inspection of its furnishing me with a guide for the purpose of making such tour of inspection, the undersigned hereby assumes all risks of accident incident to such tour, and hereby releases and discharges the company and its employees, and all persons for whom the company may be legally responsible from all claims, liabilities or demands for or on account of personal injuries or other damages sustained while in the plant or on the property of the company and caused by the negligence of said company or any of its employees, or any person for whom the company may be legally responsible."
While on the tour a "fault" in a 90 foot ceiling collapsed and fell killing Mr. Theilman and seriously injured Mrs. Theilman.
The Court, after extensively researching the issue, found that there had only been two other Louisiana cases dealing with the issue and involving personal injuries and in those cases the Court upheld the exculpatory provisions dealing with assumption of the risk. The two cases were Forsythe v. Jefferson Downs, Inc., 152 So.2d 369 (La. App. 4th Cir.1962), writ refused 244 La. 895, 154 So.2d 767 (1963) and Celestin v. Employers Mutual Liability Ins. Co. of Wisconsin, 387 F.2d 539 (5th Cir.1968).
However, the court distinguished those two cases from the fact situation in Diamond Crystal Salt Company, supra, by finding *733 that those two cases concerned factual situations where either the dangerous situation was both obvious and known to both parties or where the instrumentality causing harm was in the exclusive possession and control of the person injured. The Court then went on to conclude that the danger of a collapse in the "fault" injuring the Theilmans was not obvious, and even if it had been observed it would not have been appreciated by a person of ordinary understanding so as to result in assumption of the risk. The Court also found that the cause of the injury was in the exclusive control of the mine operators and only they had knowledge of the danger.
In the present case the "skate at your own risk" sign is far less detailed than the release in Diamond, supra, and Forsythe, supra. In addition, the only dangers which were obvious to the plaintiff were those such as her falling due to her losing her balance and falling over another skater who might lose his or her balance.
In spite of the fact that the plaintiff did see the two young boys speeding around the rink, it would be reasonable for her to conclude these children would be stopped from exercising such behavior on the skating rink by the floor guards whose duty it was to prevent such behavior. The danger of these two young boys causing injury to a patron by speeding and weaving in and out of the traffic was within the control of the floor guards whose duty it was to prevent such practices. We conclude that the danger to plaintiff was neither obvious nor apparent and as such she could not have assumed this risk. Accordingly, the sign did not relieve the owner of the skating rink of negligence and the jury should have been instructed with the charge presented by the plaintiff.
Although the general instructions given by the court did describe what was necessary to find that someone has assumed a risk, it appears that the jury could not understand exactly what risks were assumed. From the nature of the "skate at your own risk" sign, it is reasonable that any risk of injury, no matter what the cause was or whose fault it was, was assumed by the customer. In fact, when testimony regarding the sign was objected to by plaintiff's counsel the court overruled the objection and allowed the defendant to proclaim that "the sign speaks for itself".
"If instructions concerning negligence and liability are confusing or misleading, or omit an applicable essential legal principal, such instructions constitute reversible error." Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975); Miller v. Fogleman Truck Lines, Inc., 398 So.2d 634 (La.1981).
In the present case the failure to instruct the jury that the "skate at your own risk" sign did not relieve the defendant of any negligence constituted an omission of an essential legal principle and thereby misled the jury. Accordingly, the jury's verdict is subject to reversal.
However, it would appear that if the jury was misled and/or an applicable essential principle of law was omitted, these facts, in and of themselves, would allow for reversal of the verdict only if that verdict, based upon the facts of the case, is clearly wrong.
"A jury verdict should be maintained unless the record reflects that its conclusions of fact are not supported by the evidence, and/or its application of the law is clearly erroneous. Perrin v. St. Paul Fire and Marine Insurance Company, 340 So.2d 421 (La.App. 4th Cir.1976). In the absence of manifest error, the appellate court is not to disturb the finding of the jury which has evidence before it furnishing a reasonable factual basis for its verdict, based on its reasonable evaluation of credibility; Harris v. State through Huey P. Long Memorial Hospital, 378 So.2d 383 (La.1979); the record does not reveal that the finding is clearly wrong or manifestly erroneous. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978)."
As indicated above the plaintiff only assumed the ordinary risks of her recreational activity. We conclude that the refusal of plaintiffs jury instructions numbers three and five was clearly erroneous.
*734 In Broussard v. Texas Industries, Inc., 416 So.2d 1349 (La.App. 3rd Cir.1982), the court discussed the standard for granting a new trial at pp. 1351:
"The standard for granting a new trial in such cases was considered by the Louisiana Supreme Court in Gonzales v. Xerox Corporation, supra, and again in Ragas v. Argonaut Southwest Insurance Co., 388 So.2d 707 (La.1980). These cases hold that if the record is complete and an appellate court has all the facts before it, an erroneous jury instruction does not warrant a remand. See also Boyette v. Auger Timber Co., 403 So.2d 800 (La.App. 2nd Cir.1981).
The rule of Gonzales results in depriving a litigant of a jury trial on a jury issue. This is clear as is noted in the dissents in Gonzales and Ragas. The rule results in the anomaly that, while we as the intermediate appellate court hold that the trial court erred in depriving appellants of a jury consideration of serious issues of fact, we are at the same time mandated to go ahead and decide that issue on the record under our own constitutionally granted authority to review lower court findings of fact. The rule is grounded on judicial economy and expediency.
It is not every trial court error which may be corrected on appellate review. The Supreme Court in Ragas, in commenting on Gonzales, said:
`Where a finding of fact is interdicted because of some legal error implicit in the fact finding process or when a mistake of law forecloses any finding of fact, and where the record is otherwise complete, the appellate court should, if it can, render judgment on the record.
This is not to say, and Gonzales should not be read to require, that the appellate court must find its own facts in every such case. There are cases where the weight of the evidence is so nearly equal that a first-hand view of witnesses is essential to a fair resolution of the issues. The appellate court must itself decide whether the record is such that the court can fairly find a preponderance of the evidence from the cold record. Where a view of the witnesses is essential to a fair resolution of conflicting evidence, the case should be remanded for a new trial.'"
Here as in Broussard, supra, we conclude that the record before us is complete and we believe it is our duty to decide the matter on the merits.
The plaintiff and her witnesses estimated the number of skaters on the floor at 100 while the two floor guards estimated between 40 and 50. The plaintiff and her witnesses indicated that they did not hear any announcement over the public address system with regard to the rules of skating. Furthermore, the plaintiff and at least one of her witnesses testified that they observed the same two boys skating very fast while weaving in and out of traffic and that those two boys skated past the plaintiff in such a manner on 4 or 5 occasions before the plaintiff's fall.
The manager of the skating rink testified that there are stringent duties required of floor guards, one of which is to stop skaters from weaving in and out of traffic while skating too fast. The two floor guards on duty, a middle aged man who also played records in addition to his duties as a floor guard and a teenage boy, testified that they exercised their duty as floor guards and that they had previously worked as the only floor guards without any complications when there were 700-800 people skating. Billy Ebersole, the 16-year-old floor guard testified that he could not recall seeing anyone skating too fast or weaving in and out of traffic and that he did not stop anyone for doing the same within the hour before the plaintiff fell. He also stated that he had taken a written test, the subject matter of which concerned the duties of a floor guard. However, John Sammartino, the floor manager and the other floor guard on the date in question, stated that he could not recall anyone ever having taken such a written test. He also stated that it was pretty easy to spot speeding skaters from the center circle and that no one complained of speeding skaters during the hour before the plaintiff's fall.
*735 On the other hand, Irma Hearn, one of the two adults at the skating party, testified that she observed the people skating for thirty to thirty-five minutes and kids were being very wild, going in and out, passing one another, trying to race one another on the floor. She didn't hear anyone announce any rules, nor did she observe any supervision of the skating rink. Patricia Ortego testified that she removed her three-year-old daughter from the skating floor because of the boys skating fast and she was afraid they would knock her daughter down.
The plaintiff, Alemitta Phillips, testified that she had gone about three or four times around the rink, when two boys passed her. They appeared to her to be racing. These boys passed her about five or six times cutting in to catch one another when they fell in front of her causing her to fall down breaking her leg. An analysis of the testimony as a whole reveals to us that plaintiff's witnesses testified to positive occurrances, while defendant's witnesses testified to negatives, eg.they didn't see anything unusual.
These facts, coupled with the failure to give the plaintiff's requested jury charges, numbers three and five, indicate to this Court that the verdict of the jury was clearly wrong and should be reversed.
Having concluded that the verdict should be reversed, under Gonzales v. Xerox Corporation, supra, we now assign damages. The Plaintiff suffered a broken tibia and fibula and wore a cast of some type for a period of nine months. She complained that she was confined to bed during this time and was in considerable pain and discomfort. She complains of pain while standing and walking and that since the accident her foot swings out when she walks. She also complains about a "pulling" feeling in her hip, that she has difficulty sleeping and that she can no longer enjoy the pleasurable activities that she enjoyed prior to the accident. She complains that she has pain in her leg, back and hip area and that it is present while she works. In fact, Thomas Hebert, a former employer of hers testified that he could see she was in pain while she was working.
Dr. H.R. Soboloff testified that he examined the plaintiff and found that she had a 10 degree loss of function in ankle dorsiflexion and a 15 degree loss in plantar flexion. He found that she had a 15% loss of function of her left ankle and that she would also continue to experience trouble and pain while walking on uneven surfaces, such as New Orleans sidewalks, and while ascending and descending steps. He also stated that the plaintiff had developed osteoporosis, a leaking out of the bone salts caused by not applying full stress to her knee, as a result of the accident. He stated that this condition may or may not go away.
Dr. Charles Billings' testified that the fracture sustained by the plaintiff did not heal completely in a anatomical position. However, he qualified his answer by stating that most fractures do not heal in such a way and that he felt the bones had become satisfactorily aligned.
He stated that difficulty in walking could cause a strain upon the hips and the back and that such a trauma could conceivably have caused the narrowing in the disc of spaces shown in the plaintiff's x-rays. However, he qualified this by testifying that such a trauma was unlikely to be the sole cause of this type of back problem. He explained this further by stating that if an individual had such a back problem he or she would complain of pain within 6 months to a year and it was not until a considerably longer period of time that the plaintiff complained of back pain. Finally he stated that the narrowing in the discs is significant enough to warrant treatment.
Under the facts enumerated above we conclude that an award of $12,000 in general damages for past, present and future pain and suffering is adequate to compensate plaintiff in this matter. Additionally our examination of the record as well as all exhibits filed herein fails to show any items of special damages proven at trial other than lost wages. Plaintiff testified that she lost four months of work at $200.00 per month and is entitled to $800.00 in lost *736 wages. We have included this in the general award.
Accordingly, the judgment of the trial court rendered in favor of Defendant, Skate Country East, and against Alemitta Phillips is reversed and set aside, and judgment is rendered in favor of Alemitta Phillips and against Skate Country East for $12,000 together with legal interest thereon from the date of judicial demand until paid and all costs including costs of this appeal.
REVERSED AND RENDERED.
REDMANN, C.J., dissenting with written reasons.
REDMANN, Chief Judge, dissenting.
The testimony does not "reveal" that the facts are what plaintiff's witnesses testified to. There is credible testimony to the contrary from defense witnesses. A reading of the entire record suggests that the jury disbelieved plaintiff's witnesses[1] and not that they were misled by the jury charge on assumption of risk.[2]
Perhaps ideally the jury charge should have included a specific declaration concerning a "skate at your own risk" sign. But it may be doubted that the charge as given constitutes reversible error.
Assuming, however, that the charge was reversible error, the consequence is not that the losing party wins, but rather that the appellate court must either independently evaluate the evidence to decide the case correctly, disregarding the jury's verdict but not automatically reversing it (Gonzales *737 v. Xerox Corporation, 320 So.2d 163 (La. 1975)), or if necessary remand for retrial to a correctly charged jury (see Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707 (La. 1980)).
If this writer is obliged to decide this case on the record, he would vote in favor of defendant because plaintiff did not bear the ordinary burden of proving her case by credible evidence (see n. 1). The view that the defense testimony is "negative" and therefore not probative is in error. The defense witnesses did not merely testify negatively that they didn't see the dangerous misbehavior that plaintiff's witnesses said prevailed during 30 minutes. The defense witnesses testified positively that they were on duty, looking for dangerous misbehavior; that they were skating in an inner circle in a direction opposite to the flow of the rink patrons, who were limited to skating in an outer circle, making it easy to see any dangerous skating; that they (the testifying guards) would have seen dangerous misbehavior of the kind plaintiff's witnesses described, if it had occurred; and that they (the guards) did not see any such misbehavior during the hour prior to plaintiff's fall. That is simply not mere negative testimony.
Finally, if this writer is obliged to accept plaintiff's witnesses' testimony (see n. 1), this writer would hold that plaintiff did indeed assume the risk of the precise incident that occurred. If, as plaintiff's witnesses testified, during the whole 35 minutes that the 45-year-old plaintiff was on the floor, the two young boys were "skating fast ... making people collide ... falling down on the floor," then plaintiff should have either stopped skating to avoid the same fate that (according to her witnesses) was befalling so many, or at least called upon the guards to make the havoc-causing youngsters behave.
NOTES
[1] The verdict of the jury was 9 for the verdict and 3 against the verdict; the minimum necessary to render a verdict. LSA C.C.P. Art. 1795.
[1] Perhaps worst was the testimony of the 11-year-old girl for whose birthday a party at the rink was being held: Q. And these boys that now, you say these boys did what now? Before [plaintiff] tripped over them what did you see? A. They were going in and out the traffic and they were making people collide to each other, and people were skating and colliding to each other and falling down on the ground there were so many people out there and they were going in and out the traffic and out the people skating around them. Q. Did you notice someone there from the Skate Country, you said? A. Yes. Just one old man, and he was skating in with the traffic.... Q. Can you tell us how longfor how long a period of time you had seen these boys before they passed [plaintiff] right before she tripped over them? A. About 30 minutes. Q. What were they doing during that 30 or 35 [sic] minutes. A. They were skating fast. They passed me up about four or five times and they were going in the traffic making people collide and everything. They were falling down on the floor. They had people falling on the floor and everything. MR. BRADLEY: I have no further questions. CROSS-EXAMINATION BY MR. SCHMIDT: Q. Wendy, how did you know that there were five other birthday parties and the regular session that you were waiting on? A. Because my mother asked the lady. She thought we were having a party all alone by themselves (sic.) We thought it was a private party because she called over the phone and my momma went and asked her and she said there was five other parties plus the session. Q. Were you standing there when your mother talked to the lady? A. I was. Q. You say there was about a hundred people on the floor when the accident happened? A. I did. Q. How do you know that, Wendy? A. Because there was a lot of people out there and they were colliding. People were up against one another skating. Q. I understand that you say that there was a lot of people out there and a lot of people colliding, but that's not my question. My question is: How do you know there was a hundred people? Are you saying there was a hundred people just because you saw a lot of people colliding or are you just giving us a rough estimate? A. One time I went there with my friend and they had people like that. She said that day they had four or five birthday parties. Q. So you were upset that they had these people and you didn't think there was going to be that many? A. I was.
[2] The charge follows, in its central part, Johnson, Pattern Jury Instructions in Louisiana Civil Cases (1978), p. 77. As given, the charge was: Another of the defenses which the law permits the defendant in this case to raise is that the person injured assumed the risk of her own injury, thus barring her recovery. On this issue, the defendant has the burden of proof. To conclude that the plaintiff assumed the risk of her own injury, you must find that defendant has proved by a reasonable preponderance of the evidence that plaintiff fully understood the danger which was involved and that plaintiff then voluntarily exposed herself to the danger, or risk of harm. In this connection, you must determine the question on the basis of what this plaintiff in this lawsuit understood and what she encountered voluntarily. If you find that the plaintiff assumed the risk of the harm that happened to her, then you must return a verdict for the defendant. However, if you find that the plaintiff did not assume the risk of harm, then her conduct on this issue will not bar her recovery.