STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

04-1230

FRANK ALAIMO

VERSUS

RACETRACK AT EVANGELINE DOWNS, INC., ET AL.

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 20030536D
HONORABLE EDWARD D. RUBIN, DISTRICT JUDGE

**********

MARC T. AMY
JUDGE

**********

Court composed of John D. Saunders, Marc T. Amy, and Michael G. Sullivan, Judges.

AFFIRMED.

John M. Madison, Jr.
Wiener, Weiss & Madison
Post Office Box 21990
Shreveport, LA   71120-1990
(318) 226-9100
COUNSEL FOR DEFENDANTS/APPELLANTS:
    Scottsdale Insurance Company
    Old Evangeline Downs, LLC
    Peninsula Gaming
    M T Holdings
    The Evangeline Downs, LLC

Gregory J. Doucet
223 South Main Street
Opelousas, LA   70570
(337) 948-3500
COUNSEL FOR INTERVENOR/APPELLEE:
    John L. Speyrer, Inc.

**Alyce C. Richard**
**223 South Main Street**
**Opelousas, LA   70570**
**(337) 948-4418**
**COUNSEL FOR INTERVENOR/APPELLEE:**
    **John L. Speyrer, Inc.**

**Kevin R. Duck**
**Post Office Box 2967**
**Lafayette, LA   70502-2967**
**(337) 269-8850**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Frank Alaimo**

AMY, Judge.

The plaintiff filed suit seeking damages due to the death of his thoroughbred racehorse following a collision with an infield gate at the defendant racetrack. The horse's breeder intervened, seeking recovery of breeder's awards he asserts he would have recovered had the horse continued racing. The trial court found in favor of the plaintiff, concluding that the condition of the gate resulted in the horse's death. Damages were awarded to the horse owner and the breeder. The defendant appeals, questioning both the determination of liability and the damages awarded. For the following reasons, we affirm.

### Factual and Procedural Background

At issue is the liability associated with the August 14, 2002 death of the racehorse of the plaintiff, Frank Alaimo. The accident occurred at the defendant racetrack, Evangeline Downs, as the horse, a six-year-old gelding named "Lucky Man," was being exercised by rider Jill Kinsey. The horse was on its second lap of the track and was exercising at a speed referred to as a "clip." Ms. Kinsey reported that as the horse approached a gate to the infield area, she noticed that the gate was open. Ms. Kinsey explained that although she tried to move the horse from the rail, it was too late. The record indicates that the horse came in contact with the gate causing a portion of the gate, the gate's latch, or the rail, to enter Lucky Man's back left stifle. Due to injuries from the collision, Lucky Man was euthanized.

The plaintiff filed suit, seeking damages related to the death of Lucky Man. The Racetrack at Evangeline Downs, Inc., d/b/a Evangeline Downs, along with the track's lessee, Old Evangeline Downs, LLC, and operator, Peninsula Gaming Company, were named as defendants. Scottsdale Insurance Company, as the track's insurer, was also named as a defendant. (Defendants hereinafter collectively referenced as "the defendant.") Subsequently, John L. Speyrer, Inc., filed a petition

of intervention, seeking compensation for breeder's awards Mr. Speyrer asserts would have been forthcoming from Lucky Man's career if the accident had not occurred.

The petition asserted that the infield gate was negligently left open, causing the accident. The defendant, however, asserted that the gate was closed at the time of the accident and that the accident was caused when Lucky Man struck the gate arm, causing it to swing open and allowing the horse to come into contact with the exposed gate arm. This was caused, the defendant contends, by Ms. Kinsey's inability to control the horse.

Following a bench trial, the trial court entered judgment in favor of the plaintiff, finding Ms. Kinsey's version of events credible. The trial court awarded damages in the amount of $38,000 to Mr. Alaimo and $12,000 to Mr. Speyrer.

The defendant appeals, assigning the following as error:

A. The trial court erred in not granting defendants' motion for involuntary dismissal after the close of the plaintiff's and intervenor's cases.

B. The trial court erred in not allowing Don Stemmans to testify regarding the value of Lucky Man.

C. The trial court erred in not holding that the accident was a freak accident for which Evangeline Downs should not be held liable.

D. The trial court erred in failing to find comparative fault on the part of plaintiff, or, if not the fault of plaintiff, through the fault of a third party for whom defendant was not responsible.

E. The trial court erred in awarding any damages to plaintiff and intervenor, because there was not sufficient evidence in the record to justify any award for property damage which is a special damage. The trial court apparently believed it was awarding "general" damages.

2

**Discussion**

*Liability*

The defendant questions the finding of liability, asserting that the accident was of such an unusual and unforeseeable nature so as to prevent the imposition of liability. Furthermore, the defendant points to evidence in support of its position that the accident was not caused by an open or defective gate, but by the horse running into the gate arm, thereby causing it to break apart and injure the horse.

The issue of liability in this case involved the determination of a single factor, namely, whether the infield gate was open at the time of the accident or whether the accident was caused by the horse running into the closed gate. Testimony was presented at trial indicating that it was the racetrack outrider's responsibility to ensure that the gate was closed at the time horses were on the track. The defendant presented not only the testimony of the outrider, Shane Sonnier, regarding his certainty that the gate was closed, but that of others who were at the track as well. However, the trial court did not accept this version of events and, instead, found merit in the testimony of Ms. Kinsey. In ruling, the trial court explained:

> The Court finds that the plaintiffs have proven their case, and the intervenor has proven their case by a preponderance of the evidence.
>
> The Court listened to the testimony of Jill Kinsey, who was the only eyewitness to this accident, and who testified unequivocally that the gate was open, which caused the accident. And I think that was a hazard that should not have been, and for that reason I find the defendants liable.
>
> The Court was unimpressed with the testimony of Richard Winzy, Shane Sonnier, and Steve Bourque. I didn't find their testimony credible at all.
>
> For that reason, I'm going to find in favor of the plaintiff and the Court is going to award Mr. Alaimo the sum of thirty-eight thousand ($38,000), and Mr. Speyrer the sum of twelve thousand ($12,000).

3

In *Todd v. State Through Social Services*, 96-3090, p. 7 (La. 9/9/97), 699 So.2d 35, 39, the Louisiana Supreme Court explained that "[e]very negligence case must be decided on its own facts and circumstances." Discussing the scope of the duty element of the duty-risk analysis, the supreme court remarked that: "In some instances a risk may not be found within the scope of a duty where the circumstances of that particular injury to that plaintiff could not be reasonably foreseen or anticipated, because there was no ease of association between that risk and the legal duty." *Id.* It appears to be this portion of the duty-risk analysis that is questioned by the defendant in its assignment of error.

Our review of the record reveals support for a finding that the injury or damages sustained by this plaintiff, *i.e.,* injury and subsequent death of his racehorse from collision with the gate, is within the scope of the duty owed. Witness testimony indicated that the infield gate is kept closed while horses are on the track. In fact, according to the testimony of the racetrack's general manager, ensuring the closure of the gate is a responsibility of the racetrack outrider. According to Mr. Sonnier, the outrider on duty at the time of the accident, the gate must be kept closed as a running horse will sometimes try to enter the opening. Given the testimony indicating that the gate was kept closed to prevent just such an accident, we find that the record supports the determination that the scope of the duty owed encompassed this type of risk, in other words, that it was a foreseeable one. *See, e.g., Forsyth v. Jefferson Downs, Inc.*, 152 So.2d 369 (La.App. 4 Cir. 1962), *writ refused*, 154 So.2d 767 (La.1963)(wherein the fourth circuit considered a case in which a racehorse swerved into a gap in the infield railing, causing fatal injuries after collision with an iron post).

Furthermore, although the defendant presented testimony indicating that the gate had been closed a few minutes prior to the accident, the trial court dismissed this

4

testimony. Rather, the trial court accepted the testimony of Ms. Kinsey, Lucky Man's rider, who explained that she saw the open gate approximately fifty feet before arriving at the gate and attempted to lead the horse from the rail, but that it was too late to do so. This type of credibility determination is best left to the trier of fact and one that will not be overturned on appeal absent manifest error. *See Lasyone v. Kansas City S. R.R.*, 00-2628 (La. 4/3/01), 786 So.2d 682. There is no such error in this case.

This assignment lacks merit.

*Apportionment of Fault*

The defendant also contends that, if the imposition of liability is found to be supported by this court, the damages must be reduced pursuant to La.Civ.Code art. 2323. In particular, the defendant points to testimony indicating that Lucky Man was a horse with a reputation for being difficult to handle. The defendant contends that, despite this reputation, the horse was ridden by Ms. Kinsey, who it alleges, was relatively inexperienced and who lacked adequate strength to control the horse. In particular, the defendant references the testimony of Mr. Sonnier and Jockey Steve Bourque who both testified regarding Lucky Man's willful nature and what they perceived to have been Ms. Kinsey's inability to control the horse.

Louisiana Civil Code Article 2323 provides, in part:

> A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.

5

B.    The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability.

In addition to the fact that the trial court found that Mr. Sonnier and Mr. Bourque lacked credibility, as explained above, the record lacks evidence that any past inability to control the horse was the cause of the accident. Rather, it was permissible for the trial court to find that, if such a past inability to control existed, it was not the cause of this accident.

This assignment lacks merit.

*Damages to the Plaintiff*

Next, the defendant questions the damages awarded, asserting that the plaintiff presented insufficient proof of the value of Lucky Man and that any award taking future winnings into account is speculative in nature. The defendant notes that the plaintiff did not present witnesses regarding the racehorse's value, but instead relied on evidence of the horse's racing history. The defendant argues that since the damages sought are not general damages, but ones for property damage, positive evidence of value was required. Furthermore, the defendant contends that assumptions regarding future racing victories are too speculative to support an award. Thus, the defendant claims, the trial court erred in awarding $38,000 to the plaintiff, which necessarily required consideration of future racetrack success.

The plaintiff testified that he paid $5,000 for Lucky Man in November 2001. Subsequent to his acquisition of the horse, Lucky Man became increasingly successful. During the eight-and-a-half-month period between the purchase and the horse's death, Lucky Man had twelve starts, with seven wins, and four second place wins, resulting in gross earnings of approximately $53,000. The plaintiff admitted that certain expenditures were associated with the ownership of the racehorse,

6

including veterinarian fees, farrier and trainer expenses, and payment of a percentage of the earnings to the jockey and trainer in the event of successful races.[1] On cross-examination, these expenses were put into context against the horse's earnings. The plaintiff explained that, given the horse's successful eight months, he intended to continue racing Lucky Man. He stated that, prior to the horse's death, his immediate plans had been to enter the horse in a race at Louisiana Downs, where the purse was approximately $25,000.

The trial court's ruling in this matter was not specific, but simply a ruling in favor of the plaintiff in the amount of $38,000. No specific reasons for ruling were given, nor particular evidence pointed to. In *Leal v. Dubois*, 00-1285, p. 4 (La. 10/13/00), 769 So.2d 1182, 1185 (citing *Bloxom v. Bloxom*, 512 So.2d 839 (La.1987)), the Louisiana Supreme Court explained that a trial court's decision must be accorded deference "even if that decision is of less than ideal clarity, if the trial court's path may be reasonably discerned, such as when its findings, reasons and exercise of discretion are necessarily and clearly implied by the record." In the present case, the specifics of the trial court's ruling is discernable, although not discernable with precision. However, the plaintiff's evidence supports a finding that the plaintiff was damaged as a result of the accident and that the associated loss could be as great as $38,000, as damages could include both the loss of the value of the horse and lost potential revenues. The defendant points out there is no guarantee that Lucky Man would have continued winning as he had done during the eight months of the plaintiff's ownership. Nor is there any evidence regarding how long the horse could have continued to run. Here, the plaintiff established that the horse was lost.

---

[1]The plaintiff explained that, in a race won by the horse, the successful jockey is paid ten percent of the horse's earnings. The trainer also gets ten percent in the event of a win. For a second place finish, the jockey gets five percent of the horse's earnings.

Due to his past performance on the race track, it was not unreasonable for the trial court to have concluded that the horse had a future in racing, to some degree, and that damages associated with Lucky Man's loss were in the $38,000 range. *See Carter v. Louisiana State University*, 520 So.2d 383 (La.1988) (wherein the Louisiana Supreme Court affirmed a $34,000 award made for a horse's diminished value and loss of stud fees following the amputation of its tail due to veterinary malpractice, finding that this award was within the trial court's discretion).

Accordingly, this assignment lacks merit.

*Damages to the Breeder*

The plaintiff in intervention, Mr. Speyrer, was awarded $12,000 in damages. Mr. Speyrer testified that, as the breeder, he was entitled to payment equal to twenty percent of Lucky Man's earnings in any "Louisiana bred" race in which he was entered. As its name implies, a Louisiana bred horse winning a race in the State of Louisiana entitles its breeder to twenty percent of the horse's earnings in that race. This breeder's award is not the responsibility of the horse's owner, but is paid by the breeder's association. In this regard, the trial court awarded $12,000 to Mr. Speyrer.

In its brief to this court, the defendant argues that, the $12,000 awarded to Mr. Speyrer reflects its speculative nature. The defendant asserts that, given the necessary deductions for expenses and jockey/trainer fee deductions, the $38,000 award to the plaintiff assumes gross earnings of $54,080 for one year or $70,160 over a two-year period. Thus, "[i]f one assumes Lucky Man would have earned $54,080.00 in the year following the accident, then the breeder's award payments would have totaled $10,816.00 (20% of winnings). Likewise, if one assumes the horse would have won $70,160.00 in two years following the accident, then the breeder's award should have been $14,032.00." The defendant contends that these calculations reveal that the trial

8

court's $12,000 was "picked out of the air" rather than being based on an amount proven with certainty.

Our review of the record reveals support for the trial court's award insofar as it reflects acceptance of the plaintiff's statement that he planned to continue racing Lucky Man and that the horse had a history of racing successfully which had resulted in breeder's awards for Mr. Speyrer. As for the defendant's assertion that the calculation set forth above demonstrates an inconsistency in the awards to the plaintiff and Mr. Speyrer, we disagree. Any inconsistency between the awards only appears if the figure for gross and net earnings urged by the defendant are used. The trial court was not required to adopt these in arriving at the horse's potential revenues.

This assignment lacks merit.

*Involuntary Dismissal*

Due to its assertions that the plaintiff's evidence was insufficient to carry its burden of proof, the defendant contends that the trial court erred in failing to grant its motion for involuntary dismissal at the close of the plaintiff's case.[2] As we have observed, above, that the finding in favor of the plaintiff and plaintiff in intervention is supported by the record, this assignment lacks merit.

*Qualification of the Defendant's Expert*

The defendant questions the trial court's refusal to qualify one of its witnesses as an expert in appraising horses. The defendant asserts that the trial court's reference to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct.

---

[2]Article 1672 of the Louisiana Code of Civil Procedure provides, in part:

> B.    In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence.

2786 (1993), indicates that the wrong standard was applied in determining whether the witness was qualified to offer expert testimony. The *Daubert* standard, the defendant contends, pertains to the reliability of an expert's testimony.

In its attempt to qualify its expert in the appraisal of racehorses, counsel for the defense elicited testimony regarding the expert's numerous years in the racing community, his history of having bought and sold horses, and his appraisal of horses for approximately fifty other horse owners. In particular, the defendant focused upon the expert's history of having dealt with a large-volume horse owner, John Franks, under an agreement whereby Mr. Franks would ask him to attend a horse sale in order to purchase a horse. According to the expert's testimony, he was engaged for the following purpose:

> What I did is I went and looked at some horses for him and I'd call him back and tell him what these horses looked like, their confirmation, and he'd give me a price to go to, if he told me $7,500 or $10,000. But he'd always tell me, "Don't let them go for a couple of hundred dollars more. Just add a little bit to it."

The trial court referenced this testimony in denying the qualification, stating, in part:

> [The expert] , who obviously had a good relationship with Mr. Franks would go out and look at the horses and tell him what condition the horses - - what condition he thought the horse was then [sic]. Then Mr. Franks would simply say: "Well, make this bid." You know, not: "Appraise the horse and then tell me what I should I offer." Mr. Franks would say: "Look, make this offer. You can go maybe $200 more, but that's it."
>
> So, I mean, if he was an expert, why wouldn't Mr. Franks defer to his appraisal skill, if you will?

The trial court also referenced the *Daubert* factors, concluding that they were not met by this witness.

As urged by the defendant, the Louisiana Supreme Court explained in *Cheairs v. State ex rel. DOTD*, 03-680 (La. 12/3/03), 861 So.2d 536, that the *Daubert* factors

were set forth to assist in evaluating the admissibility of expert testimony and that the methodology employed by the expert was the paramount concern before the United States Supreme Court in *Daubert.* The supreme court further remarked, that: "The above principles should not, however, be interpreted to mean that a court should not consider an expert's qualifications when deciding whether to admit a particular expert's testimony, only that the *Daubert* case does not directly address that issue." *Cheairs*, 861 So.2d at 542. Rather, the supreme court adopted a three-part inquiry for use in considering a potential expert witness's qualification. *Id.* The supreme court explained that expert testimony is appropriate only in the event that: 1) the proposed expert is qualified to competently testify as to matters to be addressed; 2) the methodology used by the expert is sufficiently reliable as determined by a *Daubert-*type inquiry; and 3) the expert's testimony will assist the trier of fact through application of scientific, technical, or specialized expertise in understanding evidence or to decide factual issues before the court. *Id.* As explained in *Cheairs*, these factors are reflective of the considerations of La.Code Evid. art. 702.[3] A trial court's determination on qualification of an expert witness is reviewed on appeal for abuse of discretion. *Id.*

The transcript indicates that, although the trial court referenced the *Daubert* standards and found them lacking, the trial court's statement in this regard was in response to an objection by the plaintiff's counsel. At the time of ruling, and as can be seen from the excerpt above, the trial court was concerned with whether the witness tendered as an expert was competent to testify as to the issue to be addressed,

---

[3]Article 702 of the Louisiana Code of Evidence provides:

**Art. 702.      Testimony by experts**
     If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

*i.e.*, appraisal.  Given the trial court's reasons, we do not find that this determination was an abuse of discretion.

This assignment lacks merit.

**DECREE**

For the foregoing reasons, the decision of the trial court is affirmed.  All costs of this matter are assigned to the appellants, Old Evangeline Downs, L.L.C., Peninsula Gaming, and Scottsdale Insurance Company.

**AFFIRMED.**