708 So.2d 1108 (1998)
Lucille F. MILAZZO and Anthony J. Milazzo, Sr.
v.
OLSTEN HOME HEALTH CARE, INC., Upjohn Health Care Services, Joycelyn Ann Mary Buchanan, Jefferson Parish Hospital District 2 d/b/a East Jefferson General Hospital and Katherine Broussard, R.N.
No. 97-CA-30.
Court of Appeal of Louisiana, Fifth Circuit.
January 28, 1998.
*1110 Thomas A. Gennusa, II, Lisa Gennusa-Flood, Metairie, for Appellants Lucille F. Milazzo and Anthony J. Milazzo, Sr.
Kenneth M. Henke, Lafayette, for Appellees Olsten Home Health Care, Inc., Upjohn Health Care Services, Inc. and Joycelyn Ann Mary Buchanan.
Richard G. Duplantier, Jr., Michael J. Ecuyer, New Orleans, for Appellee Katherine Broussard, R.N.
James E. Hritz, Margaret M. Collett, Legal Services Division, Metairie, for Appellee East Jefferson General Hospital.
Before GRISBAUM, BOWES, DUFRESNE, WICKER and CANNELLA, JJ.
CANNELLA, Judge.
Plaintiffs, Lucille Milazzo (Mrs. Milazzo) and Anthony Milazzo, Sr., appeal from a judgment dismissing their action against defendants, Olsten Home Health Care, Inc. (Olsten), Upjohn Health Care Services (Upjohn) and its employee, Joycelyn Buchanan (Buchanan), for negligence resulting in Mrs. Milazzo's hemiparesis, mental impairment and other injuries. We reverse and render judgment in favor of plaintiffs.
On July 5, 1991, Mrs. Milazzo entered East Jefferson General Hospital for a procedure to relieve hypertrophic encephalitis, fluid on her brain. This condition is caused by dilation of the ventricular system of the brain due to narrowing of some of the normal spinal fluid passageways from the ventricle where it is generated, to the outside of the brain where it is absorbed. Dr. J. Carlos Pisarello, a neurosurgeon, in a relatively simple procedure, placed a shunt in the brain to drain the excess spinal liquid and relieve the intermittent elevation of pressure. The risks of bleeding and formation of a blood clot were explained to plaintiffs and Mrs. Milazzo chose to undergo the procedure. Surgery was performed successfully and Mrs. Milazzo was returned to her room since she was doing well. However, she complained of headache and nausea in the area of the operation. Although soreness at the site is normal, in order to be safe, the doctor ordered a computerized axial tomography (CAT scan). It was negative. On July 7th, she was still complaining of "migraine", but the nausea subsided. The doctor was not concerned because it is not unusual for a patient to suffer head pain two days after surgery. Since she was progressing well otherwise, her pain medication was changed from heavier narcotics to a less powerful drug. She was continued on an antibiotic, Klaforin.
Although Mrs. Milazzo was doing well, her husband and adult children stayed with her around the clock. Mr. Milazzo hired Buchanan, beginning on July 5, 1991, for the 11:00 p.m. to 7:00 a.m. shift.
On July 7th, Buchanan arrived at 11:00 p.m. Mrs. Milazzo's daughter, Claudia Franco, spoke to Buchanan before leaving, telling her that she had just taken plaintiff to the bathroom. She gave her a list of family phone numbers and instructed her to call someone in the family if Mrs. Milazzo's condition changed or if they were needed. Also at the start of the 11:00 p.m. hospital shift, the nurse on duty, Katherine Broussard (Broussard)[1], performed a neurological assessment, checking Mrs. Milazzo's physical and mental capacity. She found her to be neurologically intact. No further neurological assessments were made during the shift, in accordance with hospital policy. Without specific doctor's orders to the contrary, hospital policy requires the nurse to perform a neurological assessment regularly during a shift during the first 24 hours after surgery. After that time, neurological assessment was made at the beginning of each shift. Broussard went into the room at 2:00 a.m., 4:00 a.m., 5:00 a.m. and 6:00 a.m. Mrs. *1111 Milazzo was sleeping during each of those checks and the nurse did not disturb her. Broussard spoke to Buchanan and asked how the patient was doing. Buchanan told her that she was fine. Broussard told Buchanan to let her know if anything was wrong.
Mrs. Milazzo's orders permitted her to ambulate with assistance. Shortly after arriving for the 11:00 p.m. shift on July 7th, Mrs. Milazzo needed to use the bathroom. With Buchanan's assistance, she got out of bed, entered the bathroom pushing her intravenous (I.V.) pole, used the facility and returned to bed without incident. Shortly thereafter, she had to use the bathroom a second time. This time, Buchanan noticed that Mrs. Milazzo was having difficulty. She was leaning to the left and was unable to stand up. Buchanan rang the call button for assistance and two nurses' assistants arrived. They put Mrs. Milazzo back to bed and she fell asleep. Buchanan did not inform Broussard or the family of this change in Mrs. Milazzo's condition.
Dr. Pisarello arrived at approximately 6:45 a.m. During his examination of Mrs. Milazzo he discovered that she was unable to use her left arm and leg, she was unaware of her paralysis and she was unable to converse appropriately in content. He thought that she either had seizures or a stroke and immediately ordered a CAT scan and an electroencephalogram (EEG). The doctor apparently then left the hospital. When the tests results were reported to him, he arrived back within fifteen to twenty minutes. Mrs. Milazzo was taken to surgery and the operation commenced at 10:50 a.m. During surgery, the shunt was removed and a tube was installed connecting the ventricles of the brain to the outside to drain the fluid and blood. She was then placed in the intensive care unit where she remained for almost five weeks. Mrs. Milazzo stayed in the hospital for almost five months.
Doctor Pisarello testified that Mrs. Milazzo's condition was caused by a large, significant hematoma that had developed over several hours. She had slow bleeding probably from a capillary. His opinion took into account that she did not die or go into a coma. Because the hematoma was permitted to develop over a course of hours without intervention, her condition was not reversible. She was left with some left side paralysis. She has no functional use of her left arm and leg and she has impaired memory. Despite physical therapy, she is presently wheelchair-bound due to the weakness on her left side. In addition, because of the weakness in her left hand, she cannot push her wheelchair. As a result of her condition, Mrs. Milazzo fell several times. One fall resulted in a fractured and impacted hip joint, requiring hip joint replacement.
At the time of the incident, Mrs. Milazzo was 64 years old, her husband was 73 years old and they had been married for 43 years. Prior to the incident, she was very active. She did not have a driver's license, but walked to various places, such as the grocery. Mr. Milazzo drove her if it was too far to walk. As an example of her activity level, three years prior to her hospitalization she injured her knee playing football with a grandchild. Her husband is her primary caretaker and has had to undertake all the household chores. In addition, he must physically assist her in all of her personal daily needs. This includes helping her get dressed, bathing and using the bathroom. He helps Mrs. Milazzo eat since she cannot use a knife, he pushes her wheelchair and he helps her in and out of her wheelchair. Because the couple live in an upstairs duplex, their home for many years, they had to install an elevator. However, the elevator is small and the wheelchair does not fit. So in order to go anywhere out of the house, he places her in the elevator without her chair, carries the chair downstairs, helps her into the wheelchair again, moves her to the car, places her in the car and puts the chair in the trunk. The complications of moving Mrs. Milazzo from the home limit their outside activities to doctor's appointments and occasional visits to the homes of their children. On three days a week, he attends therapy for his angina condition. Mrs. Milazzo has home health help until he returns. He worries about the care of his wife if he dies before her. They hope she will not have to go into a nursing home. Mrs. Milazzo gets depressed and upset about her condition.
*1112 Mrs. Milazzo has suffered injuries related to her condition. Once, she fell in the bathtub, cutting her head and requiring stitches. A more serious event occurred when she was attempting to perform exercises recommended by her physical therapist. On that day, she was pushing herself from the kitchen table to the sink. She was supposed to then pull herself up after locking the wheelchair. Somehow, the chair did not lock and when she attempted to sit down, the chair moved out from under her and she fell to the floor, fracturing her hip. Because the joint ultimately became impacted, she underwent hip joint replacement surgery. Her total medical bills to date are $227,415.57.
Plaintiffs filed suit in July of 1992 against 1) Olsten, whose corporate name was changed from Upjohn in 1992, 2) Buchanan, it's employee-sitter, 3) Jefferson Parish Hospital District 2, d/b/a East Jefferson General Hospital, and 4) Broussard. A judge trial was held on June 3, 1996 and June 5, 1996 and the matter taken under advisement. On October 1, 1996, the trial judge rendered judgment in favor of defendants, finding no liability on the part of any defendant.
On appeal, plaintiffs do not contest the finding that the hospital and Broussard were not negligent. Plaintiffs assert that the trial judge erred in failing to find Buchanan negligent for not reporting the significant change in Mrs. Milazzo's physical condition when she first noticed it. Further, plaintiffs assert that the trial judge erred in holding plaintiffs to an artificially high burden of proof.
La. C.C. art. 2315 provides that every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. La. C.C. art. 2316 states that every person is responsible for the damage he occasions, not merely by his act, but by his negligence, his imprudence or his want of skill. Furthermore, an employer is held liable for the negligent acts of his employee committed in the course and scope of his employment. La. C.C. art. 2320.
Mrs. Milazzo bears the burden of proving every element of her case by a preponderance of the evidence, that is, whether it is more likely than not, that the harm was caused by the tortious conduct of one or more defendants. Lasha v. Olin Corp., 625 So.2d 1002, 1005 (La.1993). In determining whether the conduct of defendant is negligent, the courts apply the duty/risk analysis. Todd v. State, Through Dept. of Social Services, Office of Community Services, 96-535 (La.App. 5 Cir. 11/26/96); 685 So.2d 313, 317; Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972).
This requires the following findings:
1. That the conduct was a cause in fact of the resultant harm;
2. That a defendant owed plaintiff a duty;
3. That the duty owed was breached by a defendant;
4. That the risk of harm was within the scope of the breached duty.
Proof of causation can be by direct or circumstantial evidence, but is by a preponderance of the evidence, not by a "reasonable medical certainty." Lasha v. Olin Corp., 625 So.2d at 1005. Harmful error is produced when the term "reasonable medical certainty" is used to describe the measure of persuasion in a tort case. Id. at 1005. This is because it places a higher degree of proof on a plaintiff than is required in the ordinary civil case. Id. at 1005. When the trial court applies the wrong burden of proof, "the appellate court is required to render judgment on the record by applying the correct law and determining the essential material facts." Id. at 1006.
Whether a defendant owes a plaintiff a legal duty is a question of law. Todd v. State Through Dept. of Social Services, Office of Community Services, 685 So.2d at 317. Whether a defendant has breached a duty owed is a question of fact. Id. at 317.
In this case, the trial judge determined that Buchanan was not negligent. The trial judge did not state whether her conduct did not cause the harm or whether she did not owe a duty to report the changed condition to someone in authority. Buchanan testified that she was acting as a sitter and as such was not trained to observe "significant" changes in a patient. However, she was a certified nurse's aide and personal care attendant who was trained to monitor vital *1113 signs. She testified that she was expected to report a change if she was sent out as a nurse's aide. She unquestionably noticed a significant change in Mrs. Milazzo sometime during her shift, although she gave three different times. She told Mrs. Franco that the event occurred at 2:00 a.m., told Mrs. Milazzo's son, Tony Milazzo, that it happened between 3:30 a.m. and 4:00 a.m. and testified at trial that she noticed it between 5:00 a.m. and 6:00 a.m. At trial she said that she remembered that an early morning news program came on, thus it must have been around 5:00 a.m. or 6:00 a.m. In addition, Buchanan claimed that she informed the nurses' assistants that came to help Mrs. Milazzo back to bed and that she assumed that they would tell the nurse on duty. On the form that she signed at the end of her shift, Buchanan wrote that she had observed the change in the patient's condition and told Mrs. Franco when she came to stay with her mother at 6:45 a.m. Buchanan did not tell any family member prior to then.
Broussard, the nurse on duty, testified that no one informed her of Mrs. Milazzo's condition. She stated that each time she checked on the patient, she told Buchanan to tell her if there were any changes. Broussard testified that the nurse's assistants routinely assist patients who are ambulatory, but require assistance. It would not have been unusual for the assistants to help Mrs. Milazzo without telling her because the patient's orders noted that she was to ambulate with assistance. Furthermore, those employees are not expected to assess the patient's condition. Broussard stated that she expects a sitter to tell her of any changes. This was supported by Diane Bonitez, R.N., Director of Nursing at East Jefferson General Hospital and the medical review panel nurse member, Lara Bonnafons, R.N. Bonnafons further stated that if the sitter reported the incident to the nurse's assistants and a nurse did not arrive within five minutes, the sitter should contact the nurse. Dr. Pisarello felt that Buchanan's failure to inform the nurse of these changes in Mrs. Milazzo's ability to move was negligence. The nurse's assistants were unable to remember anything about that evening.[2]
Cheryl Adams, R.N. supervises Olsten's patient care employees. She also testified that sitters and other patient care employees are expected to report any significant changes in a patient's condition, as part of their duties. The employee is expected to report any changes that they observe to someone in authority, in this case, the nurse in charge. If the employee fails to do so, she is considered not to be in compliance with her job description.
Dr. Pisarello testified that had the changes been reported promptly, Mrs. Milazzo would have sustained reversible damage. He knew that the relentless bleeding had been slowly occurring for several hours because she would have been dead or in a coma otherwise. By the time he was informed, she was conversing inappropriately and unable to move her left extremities. By the time she was taken to surgery, she was hard to awaken, reluctant to speak, her consciousness was depressed and she was in danger of dying. He noted that her recovery has been slow, with some regression, as is common with stroke victims. Dr. Pisarello visits her at home because it is difficult for her to go out. He stated that she needs twenty-four hour care and will have to go into a nursing home if her husband dies.
The trial judge questioned Dr. Pisarello about the time that Mrs. Milazzo first showed symptoms. He asked whether the doctor could state "with reasonable degree of medical certainty" when the changes would have been first noticeable. The doctor was unable to do so, but insisted that the symptoms got worse over a period of hours. It did not happen suddenly. Even though it was four more hours before Mrs. Milazzo was operated on after the doctor discovered the problem, earlier notice of the condition would have meant that the intervention would have been that much sooner, with less damage. She was already damaged when the sitter noticed the changes. She suffered more *1114 damage from then until the doctor was notified and she suffered even more damage from the time the doctor was notified until the surgery stopped the bleeding and removed the shunt. Nonetheless, Dr. Pisarello stated that earlier intervention would have meant a greater chance for recovery.
It was harmful error for the trial judge to require proof "to a reasonable degree of medical certainty." Lasha v. Olin, 625 So.2d at 1005. Thus, we are compelled to render judgment on the record. Id at 1006.
Buchanan was hired to observe and assist Mrs. Milazzo. The nurses, the doctor and Buchanan's supervisor testified that Buchanan had a duty to report a significant change in a patient's condition to the nurse on duty or to someone in authority. Therefore, we find that Buchanan had a legal duty to report significant changes that she could observe without medical training.
Buchanan had assisted Mrs. Milazzo for two days before the incident. For that period of time, Mrs. Milazzo was walking fine and there was no weakness in her movements on either side. When Buchanan noticed Mrs. Milazzo could no longer walk and was leaning to one side, she knew that was a significant change in the patient's condition. Even if she informed the nurses's assistants, as she contended, she should have followed-up when the nurse did not come to see what the problem was. Thus, we find that plaintiffs proved by a preponderance of the evidence that Buchanan breached her duty to the patient by not reporting the change in condition to the nurse. Since the change in the patient's condition could and did signify post-surgical complications, the risk of harm was within the scope of the breached duty. Finally, Dr. Pisarello testified unequivocally that prompt intervention would have prevented or lessened the damage sustained by Mrs. Milazzo. Thus, she proved, by a preponderance of the evidence, that at least some of the damage was caused by the delay. Since plaintiffs proved all of the elements of negligence, we find that the trial judge erred in dismissing plaintiffs' cases against Buchanan and her vicariously liable employer, defendant, Olsten.
The medical expenses sustained by Mrs. Milazzo due to the stroke cannot totally be attributed to the delay in reporting the stroke to the proper medical personnel. She required the surgery to repair the hematoma, no matter when the doctor was notified of her change of condition. However, some of the five month hospitalization, the five weeks in intensive care, the long convalescence, the disability and the related modifications to the residence are attributable to the unnecessary delay, the negligence of Buchanan. In addition, Mrs. Milazzo suffered three falls, a fractured hip and hip replacement due to the hemiparesis. On the other hand, since the doctor was unable to state that it was more likely than not that she would have had no damage or to what exact degree she would have had residual damage had intervention been more timely, we find that a reasonable amount caused by the fault of Buchanan would be 50%, so we subtracted 50% of the totals we reached in our calculations to account for our finding that she would have suffered 50% of her damages regardless.
The amount of special damages were stipulated to by defendants, although they did not stipulate that the expenses were caused by Buchanan's actions. We conclude that Mrs. Milazzo is entitled to past medical expenses of $216,711.57. We reached this amount by subtracting from total past medical expenses of $227,415.57 the amount of $10,704 for house renovations and the elevator, because said costs are recoverable from the future sale of the house.[3]
*1115 We conclude that Mrs. Milazzo is entitled to future nursing expenses of $333,017.63 which are calculated, as follows. Mrs. Milazzo has a life expectancy of 13 years and Mr. Milazzo has a life expectancy of 9.4 years. This is all in conformity with Dr. Wolfsen's testimony and the defense stipulation of the cost of home health nursing care. For the first five years, she will require 2 hours per day of home health nursing care. The total for the first 5 years is $31,025.[4] For the second 4.4 years, she will require 4 hours per day of home health nursing care. The total for the second 4.4. years is $54,604.[5] For the remaining 3.6 years she will require 24 hours per day of home health nursing care. The total for the third 3.6 years is $268,056.[6] We then subtract $20,000 from that total to account for her comparative fault in the hip fracture and resulting damages. We find that there will be a predictable increase of 6.8% in the cost of medical care over the 13 years, but it should be discounted by 7% to arrive at present value. The total of future nursing care is $333,017.63.[7]
Past medical expenses and future nursing expenses total $549,729.20. However, as we stated earlier, we then subtracted 50% from the total to account for the damages not caused by the delay in intervention. Thus, we award plaintiff a total of $274,864.60 to compensate her for her past medical expenses and future nursing expenses.
As for general damages, Mrs. Milazzo has suffered severe loss of mobility, (functionally she requires assistance with both the most intimate and mundane of her personal daily tasks, requires the use of diapers and is 100% disabled), pain and suffering and mental distress. For general damages, we award Mrs. Milazzo $100,000[8] for the paralyses, $30,000[9] for the hip injury, $15,000[10] for her memory loss and $10,000[11] for depression/mental distress, for a total of $155,000, which is 50% of the total award. In addition, we award Mr. Milazzo $5,000[12] which is 50% of the total award for loss of consortium.
Accordingly, the judgment of the trial court is reversed and we hereby render judgment in favor of Mrs. Milazzo in the amount of $429,864.60, and in favor of Anthony Milazzo, Sr. in the amount of $5,000, against defendants, Olsten Home Health Care, Inc., Upjohn Health Care Services and Joycelyn Ann Mary Buchanan.
Costs of appeal are to be paid by appellees.
REVERSED; JUDGMENT RENDERED.
GRISBAUM, J., dissents with written reasons.
GRISBAUM, Judge, dissenting with written reasons.
I must respectfully dissent with the majority ruling for the following reasons, to-wit:

ISSUE ONELAW AND ANALYSIS
Regarding Issue One,
Louisiana jurisprudence dictates that in a tort action courts are to apply a "duty risk" analysis to determine whether a defendant's conduct was the legal cause of the plaintiff's injury.... Under a duty risk analysis, there are the following inquiries: (1) What, if any, duty was owed by the defendant to the plaintiff? (2) Was there a breach of that duty? (3) Was that breach a substantial cause in fact of the injury? (4) Was the risk and harm within the scope of the protection afforded by the duty breached? ... Whether a defendant *1116 owes a plaintiff a legal duty is a question of law. Whether a defendant has breached a duty owed is a question of fact.
Picou v. Hartford Ins. Co., 558 So.2d 787, 790 (La.App. 5th Cir.1990) (quoting Ginsberg v. Hontas, 545 So.2d 1154-55 (La.App. 4th Cir.1989), writ denied, 550 So.2d 631 (La. 1989) (citations omitted)).
I find that the appellee's (Ms. Buchanan's) duty in this case did not encompass recognizing a medical change in the appellant's (Mrs. Milazzo's) condition and knowing when a doctor was needed. The appellee's duty to the appellant encompassed being there with the patient, helping with personal hygiene, assisting her to the restroom, caring for and keeping the area clean. The appellee, Ms. Buchanan, was not informed of nor was she aware of the appellant's condition. She was not allowed to see the chart and was not trained, in any way, to understand the appellant's condition. At $5.50 an hour, with no medical training for her job as a sitter, I cannot hold the appellee to a duty beyond that for which she was hired and paid. Appellee assisted the patient to the bathroom and only knew that the patient needed more help the second time than the first because she was leaning to the left and having trouble walking. The appellee had no training so as to realize that this was serious enough to require immediate attention. The appellant exhibited no signs of pain or discomfort to alert the appellee that there was an emergency because the appellant herself was unaware that anything was wrong. Thus, finding that the appellee's duty to the appellant did not encompass recognizing a change in the medical condition of the appellant, I find no error in the trial court's ruling.

ISSUE TWOLAW AND ANALYSIS
Considering Issue Two,
If one was to find appellee's duty did encompass recognizing a change in appellant's medical condition, the issue of causation must be addressed. The appellant is not required to prove appellee's negligence caused her injury by a "reasonable medical certainty." Lasha v. Olin Corp., 625 So.2d 1002 (La. 1993).
Regarding the issue of whether a defendant's conduct is a substantial factor in causing a plaintiff's harm, the Louisiana Supreme Court has recently enunciated the following:
"Cause" in legal cause demands an inquiry into whether a legal standard of care exists and requires delving into policies for and against extending the asserted legal standard of care to protect the particular plaintiff against the particular harm.... Moreover, whereas the question of cause-in-fact involves a factual determination, the determination of legal cause involves a purely legal question....
Every negligence case must be decided on its own facts and circumstances.... In some instances a risk may not be found within the scope of a duty where the circumstances of that particular injury to that plaintiff could not be reasonably foreseen or anticipated, because there was no ease of association between that risk and the legal duty....
We are mindful that foreseeability, as the determining test, is neither always reliable nor the only criterion for comparing the relationship between a duty and a risk. Some risks that arise because of a defendant's conduct are not within the scope of the duty owed to a particular plaintiff simply because they are unforeseeable. The ease of association of the injury with the rule of conduct that is urged, however, is the proper inquiry.... Nevertheless, the extent of protection owed a particular plaintiff is determined on a case-to-case basis to avoid making a defendant an insurer of all persons against all harms....
Todd v. State, Through Dep't of Social Serv., 96-3090 (La.9/9/97), 699 So.2d 35.
The trial judge, in his Reasons for Judgment regarding the cause of Mrs. Milazzo's injuries, states that
Some time subsequent to the surgery, Mrs. Milazzo began to develop capillary oozing, and[,] some days after surgery[,] Mrs. Milazzo found herself in distress. The precise cause of the capillary oozing was not shown but this is of no moment, *1117 for it is doubtless an after-effect [sic] of the surgical intervention.
On this issue, I agree with the trial judge.
The appellant contends that the trial judge used an unduly high standard of proof to a "reasonable medical certainty." Though the record shows that questions by the trial judge contained this phrase, in his Reasons for Judgment, this language is not used. However, regardless of this, evaluating the record and using the preponderance of the evidence standard, I do not find that the appellee's conduct was a cause-in-fact of the appellant's injuries.
If appellee had a duty to recognize a change in appellant's condition and to report it, I cannot say that there was an ease of association between the duty owed to Mrs. Milazzo and the risk. The risk of paralysis could not be reasonably foreseen by this appellee, considering Ms. Buchanan was unaware of the patient's medical condition, the patient exhibited no sign of discomfort or pain to indicate an emergency, and because the appellee did not have the medical training necessary to recognize that such could cause the resulting harm.
Considering further that Ms. Buchanan was unaware of the patient's condition, it is not reasonable to hold that the risk of paralysis was foreseeable. Ms. Buchanan did not know for what the patient was being treated nor did she possess the knowledge of medicine to understand the risks of the surgery Mrs. Milazzo had just undergone. Furthermore, the doctor testified that the hematoma developed over a period of several hours. There is conflicting evidence as to when this incident occurred. Appellant failed to prove by a preponderance of the evidence that, had a doctor been notified at the time of the incident, her condition would not be so severe because the evidence does not establish that the incident occurred at the time which appellant claims it did. Therefore, I find that the appellee's conduct was not a substantial factor in causing the appellant's condition and would affirm the trial court's judgment.
NOTES
[1] Broussard was a licensed practical nurse in July of 1991. She has since become a registered nurse.
[2] The nurses' assistants were not called to testify. The parties stipulated that they would testify that they could not remember.
[3] We do not have a detailed breakdown of the hospital charges. However, the special expenses were listed in plaintiffs' exhibits as $158,822.63 for East Jefferson General Hospital, $31,803.94 for Touro Rehabilitation Center, $3,823 for Pontchartrain Bone & Joint, $1,331 for Dr. Gary Glynn, $1,593 for Delta Radiology, $2,727 for Jefferson Medical Services, $790 for Dr. Donald Bell, $3,896 for Olsten, $8,910 for Dr. Pisarello, $60 for Dr. R. Hugh Fleming, $2,450 for Dr. Brad Collins, $505 for Internal Medical Group, $4,204 for renovation to the residence, and $6,500 for elevator installation in the residence. The total is $227,415.57.
[4] 2 hours per day @ $8.50 per hour = $17.00 per day × 365 days in a year = $6,205 per year × 5 years = $31,025.
[5] 4 hours per day @ $8.50 per hour = $34.00 per day × 365 days in a year = $12,410 per year × 4.4 years = $54,604.
[6] 24 hours per day @ $8.50 per hour = $204 per day × 365 days in a year = $74,460 per year × 3.6 years = $268,056.
[7] $31,025 + $54,604 + $268,056 = $353,685 - $20,000 = $333,685 - $667.37 ($333,685 ×.2%) = $333,017.63.
[8] $200,000 × 50% = $100,000.
[9] $60,000 × 50% = $30,000.
[10] $30,000 × 50% = $15,000.
[11] $20,000 × 50% = $10,000.
[12] $10,000 × 50% = $5,000.