699 So.2d 35 (1997)
Sheila TODD, individually and on behalf of her deceased son, Joshua Todd
v.
STATE of Louisiana, Through the DEPARTMENT OF SOCIAL SERVICES, OFFICE OF COMMUNITY SERVICES, Cody Labauve, and XYZ Insurance Company.
No. 96-C-3090.
Supreme Court of Louisiana.
September 9, 1997.
Rehearing Denied October 31, 1997.
*36 Richard P. Ieyoub, Atty. Gen., John G. Morgan, Baton Rouge, for applicant.
Randall J. Meyer, New Orleans, Leonard L. Levenson, Zara L. Zeringue, Belle Chasse, Cynthia K. Meyer, New Orleans, for respondent.
KNOLL, Justice.
Sheila Todd (Todd) brought this action, individually and on behalf of her son, Joshua Todd (Joshua), for his wrongful death after 11-year old Joshua committed suicide by hanging. Plaintiff alleges that Cathy Cody LaBauve (LaBauve), a caseworker-investigator for the Office of Community Services through the Department of Social Services for the State of Louisiana (OCS), negligently removed Joshua from his mother's custody and failed to properly secure his safety, causing Joshua's death. The trial court found OCS and LaBauve jointly, severally, and solidarily liable for the wrongful death of Joshua. Todd was awarded $300,000 for the loss of love, affection, service and society of her deceased son and $25,000 for the pain and suffering experienced by Joshua prior to his death in addition to special damages totaling *37 $11,382.14. The Fifth Circuit Court of Appeal affirmed the trial judge's holding that LaBauve's negligent action caused Joshua to be removed from his home and separated from his mother. 96-535 (La.App. 5 Cir. 11/26/96), 685 So.2d 313. The court found that this resulted in harm to both Joshua and his mother and thereby contributed to the child's death by forcing him to be left alone and unattended. We granted certiorari to determine the correctness vel non of the lower courts in finding that the actions of OCS constituted legal cause for Joshua's suicide. 96-3090 (La.2/21/97), 688 So.2d 534. After a careful review of the record and thorough research of the law, we find no legal cause between OCS's alleged negligence and Joshua's death. Accordingly, we reverse.

FACTS
On October 12, 1993, Carol Wells, the acting principal at Jefferson Elementary School, reported to OCS that she had observed several bruises on Joshua, namely one in the shape of a hand print on Joshua's neck and back; she further stated that the bruises were the worst beating she had seen in 27 years of teaching. OCS classified the Todd case as a Level 2, immediate response priority, and assigned it to LaBauve for investigation. Upon arrival at Jefferson Elementary School, LaBauve interviewed Carol Wells, Michelle LeBlanc, Joshua's special education teacher for over a year, Kyle Todd, Joshua's younger brother, and Joshua Todd, each in approximately 10 minute sessions. These sessions were not taped. When questioned about the bruises, Joshua initially explained to Wells, LeBlanc, and his father, Roy Todd, that he and his brother had gotten into a fight; however, when further questioned, Joshua confessed that he and his mother had an argument over a homework assignment that elevated into disruptive physical contact. Wells and LeBlanc testified that Joshua was reluctant to report the altercation because his mother had told him that if he repeated what happened, he would be taken away and not allowed to see his mother again. Le-Blanc also noticed on the same date at issue that Joshua was wearing a very large hooded shirt which he would pull forward when it slid back. Joshua explained to LeBlanc that his mother made him change his shirt before leaving for school in order to hide the marks on his neck. This was confirmed by Joshua's older brother, Jeremy Todd.
LeBlanc further informed LaBauve that Joshua had been given Prozac for a short period of time, approximately a week, and that it had been discontinued after he had a negative reaction to it. LeBlanc also told LaBauve that Joshua had previously been a patient at Coliseum House, a hospital for people with behavior and psychiatric problems. Neither LaBauve nor her supervisor, Yvonne Davis (Davis), who had been employed with OCS for 13 years, were overly concerned with this information, as Prozac is often prescribed for symptoms other than depression, and the hospital stay was three years prior. Moreover, Joshua did not evidence any active ideations about suicide in LaBauve's presence, nor did LaBauve speak with anyone who indicated that Joshua might harm himself.
LaBauve then contacted Todd and informed her about the investigation and requested a face-to-face meeting as well as an opportunity to conduct a home study. Because Todd was unable to leave work and unable to have visitors at work, LaBauve did not personally meet Todd on October 12, 1993. Arrangements were made for LaBauve to meet with a family friend at Todd's home later that day. After carrying out the home study, LaBauve spoke with Todd about voluntary placement for Joshua, explaining that Todd could select a friend or relative. Todd informed LaBauve that she had already spoken with Joshua's father, Roy Todd, that morning and Joshua was going to stay with him for a few days. Roy Todd confirmed the arrangement and consented to keeping Joshua until October 15, 1993, when Joshua was scheduled to meet with Dr. Samuel Brown, the contract physician for the State who specialized in child abuse and neglect. Because Todd voluntarily placed Joshua with her exhusband, Roy Todd, the State did not institute proceedings to obtain custody of Joshua.
At the time, Roy Todd lived with Henritta Todd, his mother, and his current wife, Sandra *38 Todd, in his mother's home where all three of his children, including Joshua, would stay on weekends and after school, as well as a few nights during the week. While staying with his father during the week of October 12, 1993, Joshua appeared to be content and actually expressed how much he enjoyed playing with the children in the neighborhood. No one had any reason to suspect that Joshua would harm himself.
Although LaBauve was unable to personally meet with Todd as scheduled on October 13, 1993, and October 14, 1993, Todd did not indicate during their numerous telephone conversations that Joshua had psychological problems. Davis testified that because the primary goal in child abuse cases is the immediate safety of the child and because Joshua was no longer residing with his mother, the urgency to meet with Todd had subsided.
On October 15, 1993, Joshua visited Dr. Samuel Brown, a medical expert in child abuse, having seen between 8,000 and 10,000 cases since his tenure with OCS began in 1972. Dr. Brown found a fingerprint hand mark on Joshua's posterior left upper shoulder and armpit which was consistent with the child's statement of the physical altercation. Dr. Brown, who is also cognizant of the emotional issues that may plague physically abused children and who has suggested psychiatric attention for approximately 100 children, did not notice anything in Joshua that would have indicated an imminent problem. Dr. Brown found Joshua to be a perfectly normal 11-year old child who was relaxed and very comfortable in his father's presence, yet he found Joshua wanted to tell someone about the anger he had towards his mother. Dr. Brown also confirmed that knowledge that a person was taking Prozac would not in itself indicate that the person was suicidal.
Unbeknown to LaBauve, Joshua had previously been seen by Dr. Charles Freed, an expert in child psychiatry, on September 18, 1993, because Joshua's mother was concerned about his behavior and mood. Todd had Joshua examined after Joshua had indicated to her that he wanted to harm himself, particularly due to the fact that Joshua had a friend who committed suicide just two weeks earlier. Dr. Freed's clinical perception, based on what Todd told him about the mother/child relationship, was that Joshua and Todd had a hostile-dependent relationship. Although the doctor did not feel Joshua was in any immediate danger, Dr. Freed noted that suicidal ideations may be triggered when a depressed child, who is involved in a hostile-dependent relationship, is separated from the other person. Similarly, there is an increased incidence of suicide among children when a close friend commits suicide. In addition, other factors such as who is living with the child, can also affect the child's emotional state. Although the doctor recommended a trial of Prozac for Joshua and asked that Joshua and his mother return in two weeks, Dr. Freed failed to hear from the Todds. Yet, after learning that Joshua was admitted to the emergency room at East Jefferson Hospital on September 26, 1993, for chest pain found to be related to stress, Dr. Freed attempted to contact Todd twice and left messages at her home to no avail. The physicians who treated Joshua during his stay at East Jefferson found him to be deeply affected by the recent loss of his friend and his mother's relationship with a male friend, but stated that Joshua was not suicidal or homicidal. This information was not made known to LaBauve and OCS until after Joshua's death.
After being seen by Dr. Samuel Brown on October 15, 1993, Joshua hung himself in a shed in his grandmother's backyard.

LEGAL CAUSE
OCS contends that the lower courts erred as a matter of law in finding that LaBauve's actions were the legal cause of Joshua's death. We agree.
"Cause" in legal cause demands an inquiry into whether a legal standard of care exists and requires delving into policies for and against extending the asserted legal standard of care to protect the particular plaintiff against the particular harm. See Malone, Ruminations on Cause-In-Fact, 9 Stan.L.Rev. 60 (1956); Robertson, Reason Versus Rule In Louisiana Tort Law: Dialogues on Hill v. Lundin & Associates, Inc., *39 34 La.L.Rev. 1 (1973). Moreover, whereas the question of cause-in-fact involves a factual determination, the determination of legal cause involves a purely legal question. See Dixie Drive It Yourself Sys. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962).
Every negligence case must be decided on its own facts and circumstances. Roberts v. Benoit, 605 So.2d 1032 (La.1991). In some instances a risk may not be found within the scope of a duty where the circumstances of that particular injury to that plaintiff could not be reasonably foreseen or anticipated, because there was no ease of association between that risk and the legal duty. See Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972).
We are mindful that foreseeability, as the determining test, is neither always reliable nor the only criterion for comparing the relationship between a duty and a risk. Some risks that arise because of a defendant's conduct are not within the scope of the duty owed to a particular plaintiff simply because they are unforeseeable. The ease of association of the injury with the rule of conduct that is urged, however, is the proper inquiry. Hill, supra. Nevertheless, the extent of protection owed a particular plaintiff is determined on a case-to-case basis to avoid making a defendant an insurer of all persons against all harms. Malone, supra.
The legal issue in White v. White, 479 So.2d 588 (La.App. 1 Cir.1985), as well as in Frank v. Pitre. 353 So.2d 1293 (La.1977), is very similar to the issue at hand. The plaintiff in White sued the State after his child of eighteen months was struck and killed by an automobile in front of the residence of the child's mother. Approximately two weeks before the fatal accident, plaintiff had reported to the Department of Health and Human Resources (DHHR) that the mother was neglecting the child, and asked DHHR personnel to intervene to protect his child until the custody hearing. The court held that the mere failure to investigate did not give rise to a cause of action against the State for the wrongful death of the child. It further stated that the State did not have custody of the child, and that the negligence of the mother, the car owner, and the driver could not be imputed to the State. The White court analogized the issues involved to those of Frank, in which the court refused recovery against a sheriff to a policeman who had been shot by a prisoner on a pass. This Court stated:
It is not enough to say that if [the prisoner] had not been released under the sheriff's policy of weekend passes, the tragedy would not have occurred. If [his] friend had not given him a ride to town the shooting would not have happened. There must be something more; there must be a closer connection between the act of the defendant and the injury of the plaintiff.
Frank v. Pitre, 353 So.2d at 1296.
In the present case, for Todd to recover, she must show that LaBauve and OCS breached their duty to investigate, and thereby caused Joshua's death. White, supra. That is, there must be a proximate relation between the alleged negligence and the injury. Id. at 589.
The lower courts found that LaBauve's investigation was conducted in a grossly negligent manner because LaBauve failed to conduct a face-to-face interview with Todd within 24 hours following the allegation of abuse, failed to make an audio recording of the interview with Joshua, and failed to properly investigate the allegation of abuse as well as the psychological history of Joshua.
The duty of a caseworker and OCS may be gleaned from La.Ch.C. arts. 611 and 612 and La.R.S. 9:2798.1. They provide as follows:
Art. 611
A. Any person who in good faith makes a report, cooperates in any investigation arising as a result of such report, or participates in judicial proceedings authorized under the provisions of this Chapter, or any caseworker who in good faith conducts an investigation, makes an investigative judgment or disposition, or releases or uses information contained in the central registry for the purpose of protecting a child, shall have immunity from civil or criminal liability that otherwise might be incurred or imposed.

*40 B. This immunity shall not be extended to:
(1) Any alleged principal, conspirator, or accessory to an offense involving the abuse or neglect of the child.
(2) Any person who makes a report known to be false or with reckless disregard for the truth of the report.
Art. 612
* * * * * *
G. The Department of Social Services shall set priorities for case response and allocate staff resources to cases identified by reporters as presenting immediate substantial risk of harm to children. Absent evidence of willful or intentional misconduct or gross negligence in carrying out the investigative functions of the state child protection program, caseworkers, supervisors, program managers, and agency heads shall be immune from civil and criminal liability in any legal action arising from the department's decisions made relative to the setting of priorities for cases and targeting of staff resources.
La.R.S. 9:2798.1
* * * * * *
B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.
C. The provisions of Subsection B of this Section are not applicable:
(1) To acts or omissions which are not reasonably related to the legitimate governmental objective for which the policymaking or discretionary power exists; or
(2) To acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.
In Ambrose v. New Orleans Police Amb. Serv., 93-3099, 93-3110, 93-3112, pp. 5-6 (La.7/5/94), 639 So.2d 216, 219-220, we stated:
Gross negligence has been defined as the "want of even slight care and diligence" and the "want of that diligence which even careless men are accustomed to exercise." State v. Vinzant, 200 La. 301, 7 So.2d 917 (La.1942). Gross negligence has also been termed the "entire absence of care" and the "utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others." Hendry Corp. v. Aircraft Rescue Vessels, 113 F.Supp. 198 (E.D.La.1953) (applying Louisiana law). Additionally, gross negligence has been described as an "extreme departure from ordinary care or the want of even scant care." W. Page Keeton, et al., Prosser & Keeton on the Law of Torts, § 34, at 211 (5th ed.1984); 65 C.J.S. Negligence, § 8(4)(a), at 539-40 (1966 & Supp.1993). "There is often no clear distinction between such [willful, wanton, or reckless] conduct and `gross' negligence, and the two have tended to merge and take on the same meaning." Falkowski v. Maurus, 637 So.2d 522 (La.App. 1 Cir.1993).
The OCS Program Policy Manual provides, at Section 4-510(B)(1):
B. Response Priority

The Child Protection Investigation Worker shall make every effort to initiate the investigation within the time limit specified by the response priority assigned to the investigation and recorded on the CPI-1 Form. The three response priorities are as follows:
1. EmergencyThe first face-to-face contact with the alleged child victim shall be made as soon as possible after receipt of the report by the agency. Every effort shall be made to make contact within twenty four (24) hours of receiving the report. The first face-to-face contact with the alleged victim's parent/caretaker shall also be within twenty four (24) hours of the receipt of the report by the agency.... (emphasis provided).
The OCS Program Policy Manual also provides, at Section 4-510(A)(4):
4. Audio Tape Recording of Interviews The Louisiana Children's Code, Title VI, Child in Need of Care, Article 612, Investigation of Reports, requires the *41 agency to tape record all interviews with the child or his parents conducted in the course of the investigation, if requested by the parent. Therefore, a worker should be prepared to audio tape record all of the interviews with alleged child victims and parents or caretakers. Parents shall be advised by the worker of the opportunity to request the taping at the initiation of the investigation by means of the OCS Form 470, Notice to Subject of a Report....
In situations in which it is necessary for the best interest of the child to interview the alleged child victim prior to the first face-to-face contact with the parent(s) or caretaker(s), the worker should assume that the parent would request audio taping, if asked, and tape record the interview with the child. If the child refuses to cooperate with a taped interview, the worker shall proceed with the interview without a tape recording....
While a face-to-face interview with Todd would have been the more preferred method of obtaining information as recommended by the policy manual for OCS, it is not negligence per se not to have conducted one under the circumstances of this case. From the outset, it is essential to keep the facts of this case clear. It must be remembered that the case was in the early stage of investigation, and a face-to-face meeting with Todd was not accomplished due to circumstances beyond LaBauve's control. Instead, LaBauve and Todd had several telephone conversations during the early investigation days and there was nothing to prevent Todd from disclosing to LaBauve the psychological problems she thought her son may have.
Section 4-515 (A) of the OCS manual confirms that child protection investigations are conducted primarily to determine whether a child has been or is in danger of being harmed or injured; to determine whether a parent or person responsible caused the injury or permitted the injury or harm to occur; and to protect children at risk of injury or harm, either through preventative services or, in extreme circumstances which involve immediate or substantial risk, through removal of the child from his family. As confirmed by Davis, LaBauve's immediate supervisor, the primary goal of OCS intervention is the immediate safety of the child.
The OCS manual asserts "every effort" as the standard required for meeting with the child victim within 24 hours. § 4-510(B)(1). The caseworker cannot be held to a greater standard when attempting face-to-face contact with the alleged victim's parent/caretaker when the manual uses "also" to indicate the sameness of treatment regarding contact with the child and caretaker. We find that LaBauve complied with the policy to make every effort to meet with Todd within 24 hours. OCS received the report of alleged abuse at 11:20 a.m. on October 12, 1993, to which LaBauve promptly responded. LaBauve attempted to meet with Todd that afternoon, but Todd could neither take time off of work to meet with LaBauve, nor would Todd allow LaBauve to meet her at her office. LaBauve was unable to keep their 11:00 a.m. appointment on October 13, 1993 due to an unexpected occurrence at work. Thus, we find that LaBauve complied with the OCS policy.
The lower courts further faulted LaBauve for relying on Joshua's version of events and her evaluation of Joshua's case. The evidence clearly shows that LaBauve was faced with a claim by a school principal of physical harm to a child by his mother. LaBauve immediately proceeded with an investigation of the allegation. LaBauve's first source of information was Joshua's teacher, who told LaBauve that Joshua was physically and verbally aggressive, that he exhibited hostility toward authority figures, and that he tended to exaggerate problems to get attention. Significantly, Joshua's mother failed to inform LaBauve in their telephone conversations of any mental/emotional problems she was having with her son, or fears she had for him. Joshua's version for the causes of his bruises blamed his mother as the aggressor. Dr. Samuel Brown, an experienced and expert specialist in child abuse and neglect, found markings on Joshua's body consistent with Joshua's version of the event. In Joshua's *42 interview with LaBauve, he told her that his mother slapped him on his upper arm; picked him up by the hair and dropped him, causing him to hit his head on a wooden bench; she threw school books at him, hitting his thigh; he then attempted to escape by running into the bathroom and locking the door. Joshua claimed his mother "busted the door open" and continued to slap and kick him.
We find LaBauve promptly gathered information on the first day of her investigation. On this same date, Joshua's mother, on her own accord, made arrangements with Joshua's father for Joshua to stay with him during LaBauve's further investigation of the child abuse allegations.
The early investigation did not foreclose the possibility of child abuse and therein lies the weakness of the lower courts' findings. The evidence clearly shows that LaBauve was investigating a claim of physical child abuse. The investigation was ongoing and in the early stages without any final conclusions being made when Joshua took his own life.
The lower courts also fault LaBauve for not recognizing that Joshua had a psychological disorder because she had been told that he had been prescribed Prozac, that he was in special education classes, and that he had been committed to Coliseum House for psychological problems three years previously. We find this information too scant to alert a caseworker in the early days of an investigation for physical child abuse to the profound psychological problems Joshua was apparently suffering. When compared to the more focused details LaBauve was gathering on the allegation of physical abuse, this information is more likened to background material. In reaching this conclusion, we find it significant that Joshua's mother failed to tell LaBauve in the several telephone conversations they had that Joshua had psychological problems and might harm himself. If Todd felt this information was urgent, she did not need a face-to-face conversation with LaBauve to alert LaBauve to this harmful possibility. The only reasonable conclusion to draw from Todd's failure to inform LaBauve of Joshua's psychological problems is that Todd herself did not feel that Joshua was harmful to himself and that his psychological problems were not urgent. Todd, as Joshua's mother, knew Joshua best and knew his propensities. In stark contrast, LaBauve became acquainted with Joshua on an allegation of physical abuse and was investigating the case only a few days when he tragically took his own life. To hold LaBauve negligent for failing to recognize a profound psychological disturbance in a child under these circumstances is purely hindsight and untenable in law.
Decisions involving the removal of a child from his home clearly lie within the scope of the duty and authority of social workers. Susan Abbott, Liability of the State and its Employees for the Negligent Investigation of Child Abuse Reports, 10 Alaska L.Rev. 401 (1993). Such decisions require personal deliberation and judgment. Although provided with guidelines, social workers are not merely performing a duty in which they are given no latitude for action. Id. The manner in which the investigation is conducted is one of discretion, unless the investigation is so incomplete that it could not be found to be thorough. Jensen v. Anderson County DSS, 304 S.C. 195, 403 S.E.2d 615, 620 (1991).
The OCS Program Policy Manual provides, at Section 4-805(B):
Emergency Removal of Children
B. Definition of Clear, Immediate, and Substantial Danger

For a child to be removed on an emergency basis, he must be in clear, immediate, and substantial danger.
1. The danger must be "clear", that is, the abuse/neglect must be obvious to those assessing the situation.
2. The danger must be "immediate", that is, the abusive/neglectful behavior is happening now or happened within twenty-four (24) hours, and is likely to happen in the near future. A key element to consider is the abusive/neglectful person's accessibility to the child.

3. The danger must be "substantial", that is, the abuse/neglect must be life threatening, i.e., the child could die or *43 suffer severe injury from the abuse/neglect.
An emergency removal of a child can be considered when all three elements of "clear", "immediate", and "substantial" danger are present. If the abuse/neglect does not fit the above definition of clear, immediate, and substantial danger, then the child should not be removed on an emergency basis.... (Emphasis added).
In the present case, LaBauve was faced with a situation that the school principal had characterized as the worst beating she had seen in her 27 years of teaching. There were bruises and markings on Joshua's body. Joshua's brother, Jeremy, substantiated Joshua's statement that on the day the school principal made the complaint with OCS, Joshua's mother made Joshua wear a very large hooded shirt to hide the marks on his neck. LaBauve made the decision that Joshua's removal would be in his best interest while she continued the investigation. Apparently, Todd also felt the situation needed defusing, since she arranged for Joshua to stay with his father before speaking to LaBauve. Joshua's removal to his father's house was completely voluntary by Todd, and Joshua was to stay with his father until the investigation was complete or until he saw Dr. Brown. Placing Joshua with his father under these circumstances was reasonable and a more normal occurrence after Joshua and Todd had a physical altercation. In light of these particular facts, we do not find LaBauve exercised poor judgment. It is more improbable and unreasonable to believe that an 11-year old child would commit suicide under these circumstances. In making this determination, we recognize the awkward balance which child abuse cases present to caseworkers, i.e., the need for delicate handling while yet looking out for the best interest of the child.
Moreover, it is pure speculation that had LaBauve had a face-to-face interview with Todd, recorded her interview with Joshua, and investigated Joshua's psychological history that Joshua would not have committed suicide. Proof which establishes only possibility, speculation, or unsupported probability does not suffice to establish a claim. Coon v. Placid Oil Co., 493 So.2d 1236 (La.App. 3 Cir.1986), writ denied, 497 So.2d 1002 (La.1986). Mere proof that something is possible is of little probative value as to an ultimate issue of fact, unless it is established with reasonable certainty that all other alternatives are impossible. IMC Exploration Co. v. Henderson, 419 So.2d 490, 509 (La.App. 2 Cir.), writ denied, 423 So.2d 1149,1150 (La.1982), reconsideration denied, 427 So.2d 866 (La.1983). Proof to substantiate a claim for damages must be clear and definite and not subject to conjecture. Zion v. Stockfieth, 616 So.2d 1373 (La.App. 5 Cir.), writ denied, 620 So.2d 882 (La.1993). A plaintiff's case must fail if the evidence shows only a possibility of a causative accident or leaves it to speculation or conjecture. Prim v. City of Shreveport, 297 So.2d 421 (La. 1974).
In the case sub judice, the record is void of any medical evidence to support that Joshua was suicidal. Dr. Charles Freed, the child psychologist who saw Joshua approximately a month before Joshua's death, testified that he did not find Joshua suicidal. Dr. Max Sugar, who saw Joshua as late as the end of September 1993, stated that Joshua was not suicidal. Todd's own medical expert testified that suicidal accidents are often impulsive and unpredictable. In the week of his death, the people who had close personal contact with Joshua were his teachers, his father Roy Todd, his stepmother Sandra Todd, and Dr. Samuel K. Brown, who all testified that there was nothing in Joshua's behavior to suggest he was suicidal.
Viewing the record as a whole, the ultimate question is whether, as a matter of law, LaBauve's actions were unreasonable, considering her position as an OCS caseworker and her knowledge of the case. If LaBauve knew Joshua's removal from his mother was reasonably likely to make him suicidal, then she had a duty to take measures to prevent that from happening. If someone had mentioned that he was suicidal, LaBauve would have at least had a duty to investigate further. Such was not the case. Rather, in their several telephone conversations, Joshua's mother gave LaBauve no inkling that *44 Joshua might be suicidal. Accordingly, because LaBauve could not reasonably foresee the suicide, we find that Todd failed to establish the legally causative link between LaBauve's actions and Joshua's suicide. Therefore, because the underlying cause of Joshua's death remains open to speculation, Todd failed to sustain her burden of proof that it is more probable than not that the State of Louisiana is responsible for her son's suicide.

DECREE
For the foregoing reasons, the judgments of the lower courts are reversed and set aside and the plaintiff's suit against Cody LaBauve and the State of Louisiana Through the Department of Social Services, Office of Community Services, is dismissed with prejudice.
REVERSED AND RENDERED.
Calogero, C.J., dissents for the reasons expressed by the District Court Judge and the Court of Appeal panel.
MARCUS, J., not on panel. Rule IV, Part 2, Sec.3.