NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2023 CA 1185

GARY DAVIS

VERSUS

DR. BRYAN BARRETT D/B/A CENTRAL STAT CARE

*Judgment Rendered:* JUL 3 1 2024

* * * * * * * *

Appealed from the
19th Judicial District Court
In and for the Parish of East Baton Rouge Parish
State of Louisiana
Case No. 629271

The Honorable Richard "Chip" Moore, III, Judge Presiding

* * * * * * * *

Benjamin P. Mouton
Eric E. Helm
Baton Rouge, Louisiana

Counsel for Plaintiff/Appellant
Gary Davis

Vance A. Gibbs
Randal R. Cangelosi
Jason R. Cashio
Karen M. Fontana Young
Baton Rouge, Louisiana

Counsel for Defendant/Appellee
Bryan Barrett, M.D., d/b/a Central
Stat Care

* * * * * * * *

BEFORE: THERIOT, PENZATO, AND LANIER, JJ.

PENZATO, J. Dissents and assigns reasons

**THERIOT, J.**

Gary Davis appeals the 19th Judicial District Court's September 11, 2023 judgment granting Dr. Bryan Barrett, M.D.'s (d/b/a Central Stat Care) motion for summary judgment. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

On May 19, 2012, Gary Davis visited Central Stat Care, a medical clinic located in Central, Louisiana, for blood work. Davis was attended to by Sarah Russem, a nurse technician at Central Stat Care and employee of Dr. Bryan Barrett.[1] While Russem was drawing his blood, Davis began to feel abnormal. Russem completed the blood draw and instructed Davis to move to a nearby examination table ("exam table"). Russem turned her back on Davis at some point thereafter, whereupon Davis fell off of the exam table.

On March 26, 2014, Davis filed a petition for damages wherein he named Dr. Barrett d/b/a Central Stat Care (collectively "Dr. Barrett") as defendant. Davis asserted negligence claims against Dr. Barrett and alleged that he sustained injuries to his head, neck, and left shoulder, all of which he asserted required ongoing medical treatment.[2] Dr. Barrett filed an answer, affirmative defenses, and a jury demand on April 30, 2014.

On April 19, 2023, Dr. Barrett filed the motion for summary judgment at issue in the present appeal.[3] Dr. Barrett argued that the expert testimony presented

---

[1] While the proceedings were ongoing, Dr. Barrett changed his name from Bryan Barrett to Melissa Rose Barrett. For ease of understanding, we will use "Dr. Barrett" throughout this opinion.

[2] Davis further asserted that he had previously filed a complaint with the State of Louisiana, Patient's Compensation Fund, Medical Review Panel Number 2013-00288, but that the medical review panel expired on March 19, 2014, by operation of law, because no attorney chairman was appointed within the time delays. The parties were deemed to have waived the use of the medical review panel as a result. See La. R.S. 40:1231.8(A)(2)(c).

[3] Dr. Barrett previously filed a motion for summary judgment on May 2, 2017, which was granted via judgment signed July 31, 2017. On August 4, 2017, the trial court signed an amended judgment wherein it stated that the July 31, 2017 judgment had been signed in error and denied Dr. Barrett's motion for summary judgment. On August 11, 2017, Davis filed a motion for new trial relating to the July 31, 2017 judgment. Davis's motion for new trial was

2

by Davis did not satisfy his burden of proof set forth in La. R.S. 9:2794. On August 14, 2023, Davis filed an opposition to Dr. Barrett's motion for summary judgment.

Dr. Barrett's motion for summary judgment came for hearing on August 28, 2023. On September 11, 2023, the trial court signed a judgment granting Dr. Barrett's motion for summary judgment and dismissing Davis's claims with prejudice. This appeal by Davis followed.

## ASSIGNMENTS OF ERROR

Davis assigns the following as error:

(1) The trial court erroneously granted summary judgment in favor of Dr. Barrett because Russem, Dr. Barrett's employee, violated the legal standards of negligence applicable to nurses.

(2) The trial court erroneously granted summary judgment in favor of Dr. Barrett because Russem left Davis unattended before he recovered and while he was still experiencing symptoms.

(3) The trial court erred in granting summary judgment as Dr. Barrett's proposed version of events raises significant factual and credibility determinations.

(4) The trial court erred in granting summary judgment because Davis produced expert medical testimony to establish Dr. Barrett deviated from the standard of care.

(5) The trial court erred in granting summary judgment because Davis produced expert testimony to establish medical causation.

## STANDARD OF REVIEW

Summary judgment procedure[4] is favored and "is designed to secure the just, speedy, and inexpensive determination of every action .... and shall be construed to accomplish these ends." La. Code Civ. P. art. 966(A)(2). In reviewing the trial

---

argued on December 11, 2017, but no ruling on the motion for new trial was ever made or filed into the record. The trial court re-heard the motion on April 22, 2019, after which it granted the motion for new trial, finding that a genuine issue of material fact existed as to the extent of Davis's recovery prior to Russem moving away from Davis's bedside.

[4] We note that the motion for summary judgment at issue in this appeal was filed under La. Code Civ. P. art. 966 prior to its amendment by 2023 La. Acts No. 317, § 1, and 2023 La. Acts No. 368, § 1, which became effective on August 1, 2023.

3

court's decision on a motion for summary judgment, this court applies a *de novo* standard of review using the same criteria applied by the trial courts to determine whether summary judgment is appropriate. *Bass v. Disa Glob. Sols., Inc.*, 2019-1145 (La. App. 1 Cir. 6/12/20), 305 So.3d 903, 906, writ denied, 2020-01025 (La. 11/4/20), 303 So.3d 651. Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can be seen only in light of the substantive law applicable to this case. *Succession of Hickman v. State Through Bd. of Supervisors of Louisiana State Univ. Agric. & Mech. Coll.*, 2016-1069 (La. App. 1 Cir. 4/12/17), 217 So.3d 1240, 1244.

After an opportunity for adequate discovery, a motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La. Code Civ. P. art. 966(A)(3); *Bass*, 305 So.3d at 906. The only documents that may be filed or referenced in support of or in opposition to the motion are pleadings, memoranda, affidavits, depositions, answers to interrogatories, certified medical records, written stipulations, and admissions. La. Code Civ. P. art. 966(A)(4)(a).

The mover bears the burden of proving that he is entitled to summary judgment. However, if the mover will not bear the burden of proof at trial on the subject matter of the motion, he need only demonstrate the absence of factual support for one or more essential elements of his opponent's claim, action, or defense. La. Code Civ. P. art. art. 966(D)(1). If the moving party points out that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense, then the nonmoving party must produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law. La. Code Civ. P. art. 966(D)(1); *Bass*, 305 So.3d at 906.

4

In ruling on a motion for summary judgment, the trial court's role is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. A "genuine" issue is a triable issue, which means that an issue is genuine if reasonable persons could disagree; if on the state of the evidence, reasonable persons could reach only one conclusion, there is no need for a trial on that issue. A fact is "material" when its existence or nonexistence may be essential to plaintiff's cause of action under the applicable theory of recovery. *Kasem v. State Farm Fire & Cas. Co.*, 2016-0217 (La. App. 1 Cir. 2/10/17), 212 So.3d 6, 12-13.

## DISCUSSION

### Dr. Barrett's Motion for Summary Judgment

Dr. Barrett attached the following exhibits to his motion for summary judgment: (1) Davis's March 26, 2014 petition; (2) Davis's deposition testimony; (3) Russem's deposition testimony; (4) the deposition testimony of Dr. Charles Kaufman, Davis's treating neurologist; (5) the affidavit and addendum of Diane Meehan, Davis's nurse expert, as well as her deposition testimony; and (6) the deposition testimony of Dr. Ronald Coe, Davis's treating emergency department physician.

Davis's Deposition Testimony

Davis, who was deposed on November 19, 2015, testified that he visited Dr. Barrett's office on May 19, 2012 for blood work. Davis alleged that Russem stuck him three or four times before she was able to successfully draw his blood. Towards the end of the blood draw, Davis began to feel dizzy and light-headed. He testified that Russem finished the blood draw, bandaged his arm, and started labelling the bottles of blood. When he informed Russem that he felt dizzy and light-headed, Russem instructed him to move to the exam table. Davis testified that he was able to get onto the exam table by himself, but that he was sweating

5

and still felt dizzy and light-headed. He told Russem that he still felt poorly, whereupon Russem instructed him to lie down on his back. Davis alleges that Russem told him to remain lying down and stated that she would "be back in a minute" before turning and walking away. He testified that the next thing he remembers was waking up on the floor.

According to Davis, this was his first bad response to a blood draw. He testified that he did not know how he ended up on the floor, but denied attempting to get up from the exam table. Davis went to the emergency room at Baton Rouge General on the evening of May 19, 2012. He testified that the emergency room doctor diagnosed him with a concussion and sent him home.[5]

Russem's Deposition Testimony

Russem, a nurse technician for Dr. Barrett at Central Stat Care, was deposed on February 11, 2016. Davis was seated in a chair when Russem entered the examination room ("exam room") to draw his blood. Russem testified that Davis seemed "very nervous" prior to the blood draw but that she asked him if he was okay and he answered affirmatively. Russem performed the blood draw and bandaged Davis's arm. She denied having to stick Davis multiple times.

At the end of the blood draw, Russem noticed that Davis had become pale and sweaty and asked him again if he was okay. Davis told her that he was not feeling well and allegedly stated that this had happened to him before. Russem, still holding a syringe containing Davis's blood, instructed Davis to get out of his chair and onto the exam table.

Russem described the exam table as having raised foam edges meant to prevent patients from falling or rolling off the table.[6] Davis was able to get onto

_____

[5] Dr. Coe, Davis's emergency room physician, testified at his own deposition that he did not diagnose Davis with a concussion.

[6] Davis attached deposition testimony of Dr. Barrett, who was deposed on July 21, 2022, to his opposition to the motion for summary judgment. In this deposition testimony, Dr. Barrett

the exam table on his own and was instructed by Russem to lie flat on his back. Russem testified that she stayed with Davis for approximately four minutes until he recovered. Specifically, she testified that Davis's color had improved and that he had stopped sweating. She also testified that Davis's speech was clear and that he was able to timely and appropriately respond to her questions. She further asserted that she asked Davis if he was okay and that he answered affirmatively before she stepped away.

Russem testified that she instructed Davis to remain lying down and turned her back on Davis. She testified that she walked six or seven steps away from the exam bed to a cabinet in the exam room to transfer Davis's blood from the syringe to tubes, noting that the exam room was small and that she was still within arm's length of Davis when she turned away to transfer the blood.[7] Russem alleged that she never left the exam room itself and that the door was closed. While Russem's back was turned, she heard a "loud slap." She turned around and saw Davis lying face down on the floor. Russem testified that she immediately yelled for Dr. Barrett, who came into the room shortly thereafter.[8]

### Dr. Kaufman's Deposition Testimony

Dr. Kaufman, Davis's treating neurologist, first evaluated Davis a week or so after the fall. When treating Davis, Dr. Kaufman attempted to determine why Davis would have had a "syncopal episode" and why Davis would have fallen off the exam table. Dr. Kaufman defined syncope as "a lack of blood flow and loss of

---

described the exam table and the clinic's exam rooms. Dr. Barrett testified that the exam table was in the shape of "a bowl effectively" with elevated sides and a recessed (sunken) center. According to Dr. Barrett, the exam tables were designed to prevent patients from accidentally falling out of the bed. The exam table was between three and four feet tall.

[7] Dr. Barrett described the exam room as a small, windowless room with a door that opens into the exam table, an exam table that sits partially behind the door when it opens, a cabinet, counter, sink, and chair.

[8] Russem further testified that she called Davis on the evening of May 19, 2012 at around 6:00 p.m. to check on him. According to Russem, Davis informed her that he had some soreness but was feeling better.

muscle tone . . . due to lack of circulation getting to the brain" – in other words, fainting. He defined a vasovagal response as "a physiological event that could result in syncope." Dr. Kaufman testified that it's nearly impossible to pass out while lying flat.[9] Because of his belief that Davis should not have passed out while lying on the exam table, Dr. Kaufman questioned whether Davis might have suffered a seizure which caused him to fall.

Dr. Kaufman ordered cardiac workup, MRIs, and EEGs to determine what could have caused Davis to faint. According to Dr. Kaufman, only the EEGs indicated mildly abnormal activity. Dr. Kaufman testified that Davis underwent his first EEG in June 2012 and that the first EEG's results were not "dramatically abnormal" but showed some suspicious activity that could indicate the occurrence of a seizure. Davis also saw Dr. Kaufman in January of 2013 and he reported that he had been experiencing "zone-outs." Dr. Kaufman ordered a second EEG, which took place in February 2013. The second EEG's results also indicated possible seizure activity.

Davis saw Dr. Kaufman again in June 2013 for frequent headaches and "some slurred speech." At this point, Dr. Kaufman prescribed anticonvulsants to Davis. He testified that Davis responded badly to the first prescribed anticonvulsant medication, but that a subsequently prescribed anticonvulsant appeared to help Davis's condition. Davis saw Dr. Kaufman once more in May 2014, where he reported having memory issues.

As of the date of Dr. Kaufman's deposition, he suspected that Davis had a seizure disorder but could not say for sure. Dr. Kaufman further stated that, based upon the information available to him, he could not confirm that Davis had a vasovagal event on the exam table. Dr. Kaufman believed that whatever mental deterioration was happening to Davis likely caused him to fall off the table. Dr.

---

[9] Dr. Barrett, the defendant, also testified that a syncopal episode is unlikely to occur when a person is in a prone position.

Kaufman was unsure whether the anticonvulsants helped Davis because of his purported seizure disorder, or if they helped him with certain depression symptoms. However, he did not believe that either of those possible issues – a seizure disorder or depression symptoms – would have been caused by the fall itself. Rather, those symptoms may have caused the fall.[10]

Dr. Coe's Deposition Testimony

Dr. Ronald Coe, Davis's treating emergency room physician at Baton Rouge General, was also deposed in connection with this matter. Dr. Coe testified that he noticed mild tenderness on Davis's scalp, which he believed was from Davis falling and hitting his head, and diagnosed Davis with an injury to his front scalp – namely, a contusion.[11] He further testified that a CT scan was performed on Davis's spine, but that the results showed no issues or cervical fractures. Dr. Coe did not have any information on what exactly may have caused Davis to fall.

Dr. Coe was also asked for his opinion on vasovagal events and syncope. Dr. Coe testified that lying down may help alleviate vasovagal response symptoms, but that it is still possible to experience syncope or faint while lying down. Dr. Coe testified that it would be reasonable to lay a patient down on an exam table if that patient was feeling ill after having a blood draw. He further testified that lying down is the best position a patient could be in if they pass out. He explained that a vasovagal episode can cause cerebral hypoperfusion (a lack of blood going to the brain), which can cause someone to pass out; if the patient lies down, there will be an increase of cerebral perfusion (or increase of blood flow to the brain) such that the symptoms should resolve.

---

[10] Dr. Kaufman also testified that, worst case scenario, the fall could have given Davis a concussion which could cause confusion and other problems for a certain period of time, but that Davis should have recovered if that was the case. He clarified that he could not diagnose Davis with a concussion, but that it was a possibility considering the fall itself.

[11] Dr. Coe testified that Davis reported his pain to be a 9 out of 10 while undergoing triage, but that Davis's pulse and blood pressure were normal or near-normal.

<u>Meehan's Deposition Testimony</u>

Meehan, Davis's expert, was deposed on September 26, 2022.[12] In her deposition, Meehan testified that she has a Ph.D. in nursing and has worked as a nurse practitioner since 1996. Meehan asserted that Russem deviated from the standard of care by not questioning Davis further when he "seemed nervous" before the blood draw. She testified that Russem should have placed Davis on the exam table in a supine position (flat on his back) prior to starting the blood draw because of the possibility of a vasovagal response caused by his nervousness.[13] Meehan also testified that once Russem noticed Davis was pale and sweating, she should have called for someone else to come into the room so that she could take care of the blood.

Meehan indicated that her proposed standard of care would be satisfied if a nurse remained at a patient's side, monitored his condition and pulse, and evaluated his physical presentation, and the patient's condition improved to the point he recovered. She also testified that if a person's vasovagal symptoms have resolved, the standard of care does not require that a third person be present.

Meehan acknowledged Russem's deposition testimony that she stayed with Davis until his symptoms had resolved, but believed that the fall likely occurred because Davis had not recovered from the vasovagal event. She further testified

---

[12] Dr. Barrett also presented an affidavit and addendum executed by Meehan. In the affidavit, Meehan asserted that Russem deviated from the standard of care by leaving Davis, who was dizzy and sweating, alone in the room. Upon learning of Russem's testimony that she did not leave the room, Meehan stated in the addendum that her opinion was unchanged and that Russem breached the standard of care by leaving Davis unattended while he was having a reaction after a blood draw.

[13] Meehan testified that Russem also violated the standard of care by asking Davis to stand up after noticing the change in his appearance and by failing to physically assist him to the exam table. However, Meehan admitted that Davis was able to get to and up onto the exam table without incident. Meehan further testified that, to her knowledge, any alleged breaches of the standard of care aside from those involving Russem turning her back on the patient had not caused any additional harm.

Meehan also testified that if a person fainted while lying down, they would likely go limp. She acknowledged that a person experiencing syncope would likely not roll off a bed.

that if a patient becomes disoriented after experiencing syncope while lying in a supine position on an exam table, one can prevent a fall by standing next to them at their bedside. She also believed that harm had come to the patient (i.e. Davis falling off of the exam table) because Russem had not called someone into the room to assist her.

**Davis's Opposition to Dr. Barrett's Motion for Summary Judgment**

Davis attached the following as exhibits to his opposition to Dr. Barrett's motion for summary judgment: (1) the affidavit of Dr. Kelly Scrantz; (2) Davis's medical records from Central Stat Care; (3) Dr. Barrett's deposition testimony; (4) Davis's medical records from a May 19, 2012 visit to Baton Rouge General Medical Center; (5) Davis's medical records from Dr. F. Allen Johnston; (6) Davis' medical records from Dr. Kelly Scrantz and The Neuro Medical Center; and (7) certified copy of correspondence and proof of mailing from Patient Compensation Fund ("PCF") File No.: 2013-00288.

Relevantly, Dr. Scrantz, a neurosurgeon, opines in his affidavit that Davis's fall caused Davis to suffer new "neck and arm symptoms" and "new onset leg symptoms," and further exacerbated an older issue with his lower back. The affidavit and narrative report do not address standard of care or causation between an alleged breach of that standard and the fall itself.

**Assignments of Error #1, #2, and #4**

Davis argues that the trial court erred in granting summary judgment in favor of Dr. Barrett because Russem, Dr. Barrett's employee, violated the legal standards of negligence applicable to nurses by leaving Davis unattended while he was still experiencing symptoms. Davis further argues that he produced expert medical testimony to establish Russem's deviation from the standard of care.

To establish a claim for medical malpractice, a plaintiff must prove by a preponderance of the evidence: (1) the standard of care applicable to the defendant;

11

(2) the defendant breached that standard of care; and (3) there was a causal connection between the breach and the resulting injury. La. R.S. § 9:2794(A); *White v. LAMMICO*, 2021-1222 (La. App. 1 Cir. 4/8/22), 342 So.3d 63, 67-68. Expert testimony is generally required to establish the applicable standard of care and whether or not that standard was breached, except where the negligence is so obvious that a lay person can infer negligence without the guidance of expert testimony.[14] *Schultz v. Guoth*, 2010-0343 (La. 1/19/11), 57 So.3d 1002, 1006-07. Moreover, the jurisprudence has held that this requirement of producing expert medical testimony is especially apt when the defendant has filed a motion for summary judgment and supported such motion with expert opinion evidence that the treatment met the applicable standard of care. *Mariakis v. N. Oaks Health Sys.*, 2018-0165 (La. App. 1 Cir. 9/21/18), 258 So.3d 88, 94. Except for cases where the causal connection between a defendant's fault and the injury alleged is obvious, expert medical testimony is also necessary to establish causation. *Jackson v. Suazo-Vasquez*, 2012-1377 (La. App. 1 Cir. 4/26/13), 116 So.3d 773, 776.

Nurses who perform medical services are subject to the same standards of care and liability as physicians. *Aymami v. St. Tammany Par. Hosp. Serv. Dist. No. 1*, 2013-1034 (La. App. 1 Cir. 5/7/14), 145 So.3d 439, 446. As Russem's employer, Dr. Barrett can be found vicariously liable if Russem was negligent in providing medical care. See *Grimes v. Louisiana Med. Mut. Ins. Co.*, 09-0292 (La. App. 1 Cir. 9/11/09), 29 So.3d 505, 508-511, *aff'd as amended*, 10-0039 (La. 5/28/10), 36 So.3d 215.

---

[14] A proposed expert in a medical malpractice case must have knowledge of acceptable standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim and be qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of care. A proposed expert's knowledge of the subject matter on which he is to offer expert testimony should be determined on a case by case basis. *Chiasson v. Louisiana Med. Mut. Ins. Co.*, 2019-0618 (La. App. 1 Cir. 6/18/20), 307 So.3d 204, 208.

The physician's conduct is always evaluated in terms of reasonableness under the circumstances existing when his professional judgment was exercised. The physician will not be held to a standard of perfection nor evaluated with the benefit of hindsight. *Bozarth v. State LSU Med. Ctr./Chabert Med. Ctr.*, 2009-1393 (La. App. 1 Cir. 2/12/10), 35 So.3d 316, 324. Mere speculation will not defeat a motion for summary judgment, and conclusory allegations, improbable inferences, and unsupported speculation are insufficient to support a finding that a genuine issue of material fact exists. *Jordan v. Cmty. Care Hosp.*, 2019-0039 (La. App. 4 Cir. 7/24/19), 276 So.3d 564, 579; see also *Todd v. State Through Dep't of Soc. Servs., Off. of Cmty. Servs.*, 96-3090 (La. 9/9/97), 699 So.2d 35, 43 (observing that "[p]roof which establishes only possibility, speculation, or unsupported probability does not suffice to establish a claim").

Because Dr. Barrett will not bear the burden of proof at trial, Dr. Barrett need only demonstrate the absence of factual support for one or more essential elements of Davis's claim. Further, if Dr. Barrett successfully demonstrates an absence of factual support for one or more of those essential elements, Davis must produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law. See La. Code Civ. P. art. 966(D)(1); *Bass*, 305 So.3d at 906.

We note at the outset that the allegedly negligent act in the instant case (namely, Russem stepping away from Davis) is not an obviously careless act such that a lay person could infer negligence.[15] Accordingly, in order to defeat Dr. Barrett's motion for summary judgment, Davis was required to oppose the motion with expert testimony establishing the standard of care, whether that standard was

---

[15] The Louisiana Supreme Court has listed the following examples of obviously careless acts from which a lay person can infer negligence: fracturing a leg during examination; amputating the wrong arm; dropping a knife, scalpel, or acid on a patient; or leaving a sponge in a patient's body. *Mariakis*, 258 So.3d at 94, n.8.

breached, and whether there was a causal connection between the breach and the resulting injury. *Mariakis*, 258 So.3d at 94.

In support of the motion for summary judgment, Dr. Barrett argued that Davis's only expert, Meehan, failed to support her opinion that Russem breached the standard of care under cross-examination. Dr. Barrett further argued that Meehan's opinions were based upon speculation.

Having reviewed the motion for summary judgment, opposition, and the exhibits attached to each, we find that Meehan's testimony is insufficient to establish a genuine issue of material fact. Meehan's conclusion that Russem breached the standard of care is largely based upon unsupported speculation – namely, her repeatedly-stated belief that Davis fell off of the exam table because he had not actually recovered from his vasovagal episode. Conclusory allegations and unsupported speculation are insufficient to support a finding that a genuine issue of material fact exists. See *Jordan*, 276 So.3d at 579; *Todd*, 699 So.2d at 43.

Russem testified about what occurred after Davis laid down on the exam table. Davis, on the other hand, cannot remember what may have occurred between him lying down on the exam table and him falling to the floor. Accordingly, only Russem – who did not witness the fall itself – can describe any of the events that occurred between Davis lying down and Davis waking up. Russem's uncontroverted testimony is that she stayed with Davis for approximately four minutes, monitoring and evaluating Davis (including observing that his skin color improved and that he had had stopped sweating) until he recovered. She further asserts that Davis answered affirmatively when she asked if he was okay prior to stepping away. In light of this uncontroverted testimony, we return to Meehan's statement that the standard of care would be satisfied if a nurse remained at a patient's side, monitored his condition and pulse, evaluated his physical presentation, and observed an improvement in the patient's condition to

14

the point of being recovered. Accordingly, the expert testimony presented by Davis does not show a breach of the standard of care in this respect.

Meehan further testified that Russem breached the standard of care by failing to call someone else to come into the room once she noticed Davis was diaphoretic and pale so that she could take care of the blood. However, Meehan then clarified that if a person's vasovagal symptoms have resolved, the standard of care does not require that another person be present.[16]

As to Meehan's opinion that Russem breached the standard of care by failing to move Davis to the exam table upon noticing that he was nervous, Meehan testified that the breaches not involving Russem turning her back on the patient and leaving him unattended had not caused any additional harm to her knowledge.

Considering the foregoing, we find that Meehan's testimony is insufficient to establish that Russem breached the standard of care. According to the uncontroverted evidence, the standard of care set forth by Meehan was satisfied. This assignment of error lacks merit.

**Assignment of Error #5**

Davis next argues that the trial court erred in granting summary judgment because Davis produced expert testimony to establish medical causation. As stated above, except for cases where the causal connection between a defendant's fault and the injury alleged is obvious, expert medical testimony is also necessary to establish causation. *Jackson*, 116 So.3d at 776.

Dr. Kaufman's deposition testimony, which is attached to Dr. Barrett's motion for summary judgment, addresses causation in depth. Dr. Kaufman believed that whatever mental deterioration was happening to Davis, who reported

---

[16] Meehan first stated that she was unsure if Davis's vasovagal symptoms had resolved "because he wound up on the floor." However, this is also unsupported speculation insufficient to support a finding that a genuine issue of material fact exists. See *Jordan*, 276 So.3d at 579; *Todd*, 699 So.2d at 43.

15

memory issues before and after the date of the blood draw, caused Davis to fall off of the exam table. Based upon the testing he had done, he suspected that Davis's fall may have specifically been caused by a seizure disorder but could not say for sure. Dr. Kaufman further stated that he could not confirm that Davis had a vasovagal event on the exam table based upon the information available to him. Accordingly, Dr. Kaufman's testimony points out the absence of a causal connection (medical causation) between Russem's conduct and the damages claimed by Davis. Therefore, in order to avoid summary judgment in favor of defendants, the burden shifted to Davis to provide expert evidence establishing that he would be able to sustain his evidentiary burden at trial of proving, not only that breaches of the applicable standard of care occurred, but also that the alleged breaches caused him to fall off the exam table. See Jackson, 116 So.3d at 776, 777.

Meehan specifically testified at her deposition that she was not offering any opinions on causation. Instead, Davis relies on an affidavit and narrative report done by Dr. Scrantz. However, as previously stated, Dr. Scrantz's affidavit and narrative report does not discuss whether Russem breached the standard of care or whether that alleged breach caused Davis to fall.

Accordingly, Davis failed to present expert testimony to prove there was a causal connection between the alleged breach and the resulting injury. Without this evidence, Davis cannot show that he will be able to carry his burden of proof at trial. We find that Davis did not satisfy his burden of proof with regard to Dr. Barrett's motion for summary judgment, and thus he has failed to establish a genuine issue of material fact. See Schultz, 57 So.3d at 1009. This assignment of error lacks merit.

16

**Assignment of Error #3**

Lastly, Davis argues that the trial court erred in granting summary judgment as Dr. Barrett's proposed version of events raises significant factual and credibility determinations. Davis highlights Russem's deposition testimony relating to her belief that Davis had attempted to sit up, and that this attempt caused him to fall.

Davis further reiterates his testimony that Russem may have left the exam room. Davis argues that this testimony raises factual and credibility determinations. However, Davis did not see Russem leave the exam room. His testimony is that he saw her turn and walk away from the table and that he does not remember anything else. As stated above, conclusory allegations and unsupported speculation are insufficient to support a finding that a genuine issue of material fact exists. See *Jordan*, 276 So.3d at 579; *Todd*, 699 So.2d at 43.

Aside from Russem's unsupported speculations, there is no evidence to suggest that Davis attempted to sit up. Likewise, Davis's unsupported speculations are the only evidence indicating that Russem may have left the exam room. The issue before this court is whether Dr. Barrett successfully demonstrated an absence of factual support for one or more of the essential elements and, if so, whether Davis produced expert testimony or factual support sufficient to establish the existence of a genuine issue of material fact. See La. Code Civ. P. art. 966(D)(1); *Bass*, 305 So.3d at 906; *Schultz*, 57 So.3d at 1009. The expert testimony presented by Davis established a standard of care, but did not establish that Russem breached that standard of care. Further, none of Davis's experts opined on what might have caused Davis to fall. As a result, Davis simply failed to produce expert testimony sufficient to establish the existence of a genuine issue of material fact. This assignment of error lacks merit.

## DECREE

For the above and foregoing reasons, we affirm the 19th Judicial District Court's September 11, 2023 judgment, granting Dr. Bryan Barrett, M.D.'s (d/b/a Central Stat Care) motion for summary judgment. Costs of this appeal are assessed to Appellant, Gary Davis.

**AFFIRMED.**

STATE OF LOUISIANA
COURT OF APPEAL
FIRST CIRCUIT

2023 CA 1185

GARY DAVIS

VERSUS

DR. BRYAN BARRETT D/B/A/ CENTRAL STAT CARE

PENZATO, J., dissenting.

I respectfully dissent from the majority opinion and would reverse the trial court judgment granting the defendant's motion for summary judgment.

The plaintiff's nurse expert, Diane Meehan, PhD., testified that the standard of care applicable to a phlebotomist is to keep the patient safe and to put the blood drawn into the tubes in the correct order so the results are not affected. Dr. Meehan testified that when Mr. Davis experienced a reaction causing him to become diaphoretic and pale, Ms. Russem deviated from the standard of care by failing to summon someone else to be in the room to monitor his condition so she could take care of the blood.

As the majority notes, Ms. Russem testified that before she stepped away from Mr. Davis, she asked him if he was okay and he answered affirmatively. However, Mr. Davis testified that when Ms. Russem asked if he was okay, he said he was dizzy. Based upon this testimony, I find there is a genuine issue of material fact as to whether Ms. Russem breached the standard of care by failing to summon someone else to monitor Mr. Davis's condition or stay with Mr. Davis until his symptoms resolved and whether that breach resulted in Mr. Davis's injury. Thus, I find the trial court erred by granting the defendant's motion for summary judgment.